No. 5-95-0425

                                  IN THE

                        APPELLATE COURT OF ILLINOIS

                              FIFTH DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

                                     )  Circuit Court of

     Plaintiff-Appellant,            )  Jackson County.

                                     )

v.                                   )  No. 94-CF-406

                                     )

LARRY THOMPSON and MARY THOMPSON,    )  Honorable

                                     )  David W. Watt, Jr.,

     Defendants-Appellees.           )  Judge, presiding.

_________________________________________________________________

     JUSTICE KUEHN delivered the opinion of the court:

     This is a case where a faulty brake light provided a pretext

to stop defendants' van.  The defective light cloaked the stop's

real purpose.  The police wanted to confirm uncorroborated

information from an anonymous telephone call.                    

     Patrol officers searched for defendants' van after a radio

dispatch from headquarters.  The dispatch conveyed information

received from an unidentified caller.  The officers were told that

defendants were headed to Carbondale from Carterville with alcohol

and guns in their van.  Officers located and followed the van

because of the dispatched information.  

     The van was initially discovered on a heading that contradict-

ed the caller's predicted route of travel.  In addition, the caller

had not clearly informed of criminal conduct.  The manner in which

the alcohol and guns were being transported was not spelled out. 

     The Carbondale police possessed uncorroborated and partially

discredited information about defendants.  The reliability of the

information could be measured only by stopping the defendants,

searching the van, and finding alcohol and guns.  The police

followed the van because of their desire to conduct such a search. 

They were aware, however, of the legal value of the information

they possessed.  Consequently, they did not stop the defendants

until they detected a traffic violation.  They waited for a valid

excuse to stop the van.

     The police effected a traffic stop for driving with a

defective right rear brake light.  The stop was not motivated by a

desire to enforce the rules of the road.  It was motivated by the

anonymous tip.  The police wanted to check the van for evidence of

more serious crimes.  The police used the faulty brake light as a

pretense to put themselves in a position to see if defendants were

illegally transporting alcohol and guns. 

     The traffic stop matured into a series of nonconsensual

searches.  As a result of those searches, police found and seized

two pistols and a bag of marijuana.  Defendants were charged with

drug and weapons violations.  The trial court suppressed the

contraband based on the pretextual nature of the stop.  The State

appeals.                                                   

     We must first decide whether the fourth amendment prohibits

pretextual traffic stops.  In People v. Guerrieri, 194 Ill. App. 3d

497, 551 N.E.2d 767 (1990), appeal denied, 132 Ill. 2d 549, 555

N.E.2d 380 (1990), this court defined the standard for testing the

legitimacy of a traffic stop motivated by reasons other than

enforcement of the Illinois Vehicle Code.  We stated:

     "[T]he proper inquiry is whether a reasonable officer

     would have made the seizure in the absence of an illegit-

     imate motive."  (Emphasis added.)  Guerrieri, 194 Ill.

     App. 3d at 502, 551 N.E.2d at 770, citing United States

     v. Smith, 799 F.2d 704, 708 (11th Cir. 1986).

This standard for testing the constitutional reasonableness of

traffic stops is no longer viable.  It has been recently  repudiat-

ed by the Supreme Court.  Whren v. United States, 517 U.S. ___, 135

L. Ed. 2d 89, 116 S. Ct. 1769 (1996).

     In a unanimous decision, the United States Supreme Court

silenced the argument that traffic offenders may challenge probable

cause stops generated by hidden reasons unrelated to enforcing the

rules of the road.  Whren, 517 U.S. at ___, 135 L. Ed. 2d at 101,

116 S. Ct. at 1777.  Ulterior motives do not invalidate police

conduct that is justifiable on the basis of probable cause to

believe that a violation of the law has occurred.  Whren, 517 U.S.

at ___, 135 L. Ed. 2d at 98, 116 S. Ct. at 1774.  The constitution-

al reasonableness of a traffic stop does not depend on the actual

motivations of the police officers involved.  Whren, 517 U.S. at

___, 135 L. Ed. 2d at 98, 116 S. Ct. at 1774.      

     The defendants operated a van without a working brake light. 

When this defect was noticed, the police possessed probable cause

to believe a traffic law of this state was being violated.  Even

though the traffic offense masked other reasons for the stop

unsupported by probable cause, ulterior motives cannot make

otherwise lawful conduct illegal.  The pretextual nature of the

stop did not invalidate it.  The police had probable cause for the

stop.  The inquiry ends there.                       

     The trial court's order of suppression rested upon our view of

fourth amendment protection in a pretextual traffic stop setting. 

Our view was wrong.  The pretextual nature of the stop was an

unsound reason upon which to bar the use of evidence.  Clearly, the

stop shrouded a desire to search.  It was, in truth, no more than

a means to reach such an end.  Nevertheless, the stop was based on

probable cause and, therefore, enjoyed constitutional footing. 

Conduct that conforms with the Constitution, regardless of the

motivation, cannot taint the evidence produced.  Only conduct that

offends the Constitution need be deterred by suppression of its

yield.  

     The trial court found that but for the anonymous tip,

unsupported by probable cause, the stop would not have occurred. 

It found that the stop was a mere pretext to conduct an exploratory

search.  The defendants were illegally stopped under the standard

set forth in Guerrieri.  This illegality formed the basis of the

suppression order.  Therefore, the trial court did not have to

focus on reasons tendered to support how and why the traffic stop

evolved into a series of searches.

     The validity of a traffic stop does not automatically afford

a reasonable basis to fulfill an underlying ambition to conduct a

search.  People v. Day, 202 Ill. App. 3d 536, 541, 560 N.E.2d 482,

485-86 (1990).  Our determination that the initial stop was valid

but pretextual does not resolve the legitimacy of the challenged

search.  Rather, it requires our examination of the record to

determine the reasonableness of actions taken after the traffic

stop. 

     The State argues that circumstances after the stop warranted

a protective search.  The protective search, if valid, produced

evidence that provided probable cause to arrest.  The arrest,

supported by probable cause, allowed incidental search of the van. 

Although we address this argument in anticipation of its submission

to the trial court on remand, we decline the invitation to declare

the search valid.  Any determination on the legality of the search,

on the record presented, would require us to decide issues of

credibility.

     The hearing on the motion to suppress involved a significant

amount of undisputed testimony.  The focal point of the search,

however, is marked by a sharp contrast in the evidence.  The

salient circumstances tendered to justify the search diverge in

unresolved conflict between the testimony of defendant Mary

Thompson and Sergeant Dan Stearns of the Carbondale Police

Department.  The facts and circumstances of the search are

presented to us as follows.                       

     In the early afternoon of Sunday, August 28, 1994, the

Thompson van, with Larry, Mary, and their 10-year-old son aboard,

traveled a path to the Carbondale AutoZone store.  The Thompsons

wanted to buy a light bulb for their van.  The Carbondale police

warned the defendants the day before that the van had a defective

right rear brake light.  The warning was accompanied by a signifi-

cant delay while a German shepherd and Carbondale officers

conducted a search of their van.                  

     Sergeant Dan Stearns (Stearns) conducted a watch meeting with

patrolmen on Sunday morning.  He told the watch of "rumors" about

the Thompsons.  He warned patrolmen that the Thompson van might

harbor drugs and guns.  At approximately noon, via dispatch,

Stearns learned of an anonymous call to the department.  According

to Stearns, the dispatch reported the transport of alcohol and guns

in the Thompson van.  Another officer at the scene, patrolman

Wilmore, contradicted Stearns' version of the dispatch.  Patrolman

Wilmore claimed the dispatch reported transport of drugs and guns. 

     Stearns spotted the van shortly after receiving the radio

dispatch.  He followed it to the AutoZone parking lot.  Larry

Thompson exited the van and started to enter the store.  Before he

could enter, Stearns stopped him.  Stearns again advised that the

van had an inoperable brake light.  Then he attended to the real

purpose for the confrontation.                             

     Standing on the parking lot, Stearns related the nature of the

anonymous call and told Larry that the van needed to be searched. 

Larry immediately disavowed the truth of the caller's claim and

added that he never drank alcoholic beverages.  Stearns responded

by conducting a search of Larry's person.  Larry had no weapons on

him.  He was allowed to enter the store.  Stearns was in close

proximity to Larry throughout this encounter.  Stearns was never

asked whether he detected any odor of alcohol.  

     During the encounter on the parking lot, two more Carbondale

squad cars arrived in response to Stearns' summons for backup.  The

squad cars encircled the van.

     After Stearns allowed Larry to leave, he did not return to his

squad car.  He walked around the van to Mary Thompson, who was

seated in the front passenger's seat.  Stearns explained that he

did not return to other duties because of the information he

possessed.  He returned to the van and its passenger to "follow up"

on the anonymous tip.                                  

     Only two of the other three officers at the scene testified at

the hearing.  Patrolman Wilmore testified that the radio dispatch

warned that defendants' van potentially harbored drugs and guns. 

Patrolman Baxter testified that Stearns had alerted the watch to

"rumors" about the van.  Both officers testified that when they

arrived at the scene of the parked van, they knew that other

members of their department had searched it less than 24 hours

earlier with negative results.

     The crucial encounter between Mary Thompson and Sergeant

Stearns is in dispute.  The evidence consists of two decidedly

different versions of the same event.                        

     According to Sergeant Stearns, he left the area of his

conversation with Larry Thompson to follow up on the anonymous tip. 

He approached Mary Thompson, apprised her of the purported

information, and told her he needed to search the van.  As he told

her of his need to search, he saw Mary stuffing something into a

duffel bag between her legs.  He saw on the console two Hardee's

cups containing an "amber colored" liquid.  He also saw the blade

of a machete knife under the duffel bag.                    

     Stearns could not recall whether he ordered Mary out of the

van or whether she exited on her own.  In either event, Stearns did

not use physical force to remove her from the van.  Stearns advised

Mary as she was exiting the van that he needed to search her bag. 

Mary had the bag on her arm and was still trying to stuff something

into it.  Stearns grabbed the bag, Mary held on, and a struggle

ensued.  Patrolman Baxter then grabbed Mary, which enabled Stearns

to remove the bag from her arm.  Stearns searched the bag and found

a gun and marijuana.  Mary was then arrested.

     According to Mary Thompson, two large plastic cups labeled

Hardee's were housed in the van's console between the bucket seats. 

The cups contained iced tea.  The machete knife was on the

floorboard of the van where it was placed the day before.  The

Carbondale police had stopped the Thompsons the day before for

operating the van on a faulty brake light.  Assisted by a German

shepherd, they searched the entire van, seized the knife, but

returned it in an unsheathed condition before allowing them to

leave.                                               

     Mary remained in the van with the Thompsons' 10-year-old son

while Larry left to enter the store.  She saw and heard Stearns'

encounter with her husband.  When her husband entered the store,

Stearns approached her side of the van and opened the door.  She

was told that the van needed to be searched.  Stearns asked for

consent to search, which she refused.  Stearns then grabbed her arm

and pulled her out of the van.  He pulled the duffel bag off of her

arm and searched it.  Thereafter, Stearns had patrolman Edwards

handcuff her and take her to his squad car.  Mary did not attempt

to stuff anything into her bag.

     Patrolman Wilmore was outside his squad car, standing near the

rear of the van during the encounter between Dan Stearns and Mary

Thompson.  He saw Mary pushing Stearns away.  He saw her resisting

Stearns' efforts to search.  Wilmore did not see Mary stuffing

anything into the bag.

     According to Stearns, patrolman Baxter assisted in retrieving

the bag by grabbing Mary Thompson.  Patrolman Baxter was obviously

close at hand to render such assistance.  Indeed, patrolman Baxter

saw Mary in the van before she exited.  He did not, however, see

any furtive movements.  He also heard conversation between her and

Stearns.  However, he was not asked to convey any of the particu-

lars of the conversation.  Additionally, he was not asked how Mary

exited the van.

     According to Mary Thompson, patrolman Edwards handcuffed her

after the bag was searched.  Patrolman Edwards did not testify. 

The Thompsons' son did not testify.  Both were potentially in

position to observe the disputed events.                   

     The State's argument assumes the truth of Stearn's testimony. 

It ignores the testimony of patrolman Wilmore that the dispatch

tracked the rumors discussed earlier that day at the watch meeting. 

It assumes that an anonymous caller tipped off the transport of

alcohol in the van, rather than drugs.  Based on Stearns' testimo-

ny, the State tenders the following argument.  Stearns' approach of

Mary Thompson allowed him to corroborate the anonymous tip by

observation of the iced tea.  The iced tea's amber color led him to

suspect that it was beer.  Thus, observation of the iced tea gave

Stearns reason to credit the caller's prediction that alcohol could

be found in the van.  If the prediction about alcohol was true, the

prediction about guns from the same source could be true as well. 

The State argues that an articulable suspicion formed.  This

suspicion, coupled with Mary's furtive conduct toward a duffel bag

that rested atop a machete knife, justified a protective search of

the bag.  The State concludes that Stearns reasonably believed,

based on "specific and articulable facts which, taken together with

rational inferences from those facts," that Mary Thompson posed a

danger to him.  See Terry v. Ohio, 392 U.S. 1, 21, 20 L. Ed. 2d

889, 906, 88 S. Ct. 1868, 1880 (1968).                 

     In addition to the testimony of patrolman Wilmore, the State's

argument ignores the possibility that Stearns opened the door,

announced a need to search the van, and then asked permission to do

so.  It ignores the possibility that, having failed to obtain

consent, Stearns pulled Mary from the van and searched her purse,

without any furtive conduct on her part.  To  accept the State's

argument, we are required to usurp a function of the trial court to

which we routinely defer.  Therefore, it is appropriate to remand

and allow the trial court to determine what actually happened. 

Because this legal issue was not the focus of the original hearing,

the trial court should reopen the evidence to afford both parties

an opportunity to present further testimony.                      

     We are mindful of a finding in the original suppression order

that touched on the absence of testimony justifying a reasonable

belief that the officers were in danger.  Stearns did not state

that his observations and responses were tied to safety consider-

ations.  Indeed, on several occasions he testified that his actions

after the stop were motivated by a desire to confirm the anonymous

tip rather than by a need to conduct a protective search. 

Nevertheless, if his testimony is accepted, it gives rise to an

inference from which the State may legitimately argue that a

protective search was warranted.  If we are reading the trial

court's view too narrowly, if its finding is based upon a broader

view of the circumstances and testimony as a whole, the trial court

should state its bases for rejecting the State's argument.  It

should enunciate clearly why it finds that Sergeant Stearns lacked

a reasonable belief that his safety was in peril.

     The standard to be applied is well established.  The Constitu-

tion permits police to take certain precautions for their own

protection.  It tolerates limited intrusions on personal security

to protect officer safety.  Terry, 392 U.S. at 21-22, 20 L. Ed. 2d

at 906-07, 88 S. Ct. at 1880.  If an officer reasonably believes

that circumstances after a traffic stop pose a danger, the law

allows a limited right to search in the absence of probable cause. 

Michigan v. Long, 463 U.S. 1032, 1049, 77 L. Ed. 2d 1201, 1220, 103

S. Ct. 3469, 3481 (1983).  "In evaluating the validity of an

officer's *** protective conduct under Terry, the `touchstone ***

is always "the reasonableness in all the circumstances of the

particular governmental invasion of a citizen's personal securi-

ty."'"  (Emphasis added.)  Long, 463 U.S. at 1051, 77 L. Ed. 2d at

1221, 103 S. Ct. at 3481-82, quoting Pennsylvania v. Mimms, 434

U.S. 106, 108-09, 54 L. Ed. 2d 331, 335, 98 S. Ct. 330, 332 (1977),

quoting Terry, 392 U.S. at 19, 20 L. Ed. 2d at 904, 88 S. Ct. at

1878-79.  Reasonableness requires analysis of all the circumstances

to arrive at a proper balance between public interest and personal

privacy.  Mimms, 434 U.S. at 109, 54 L. Ed. 2d at 336, 98 S. Ct. at

332, citing United States v. Brignoni-Ponce, 422 U.S. 873, 878, 45

L. Ed. 2d 607, 614-15, 95 S. Ct. 2574, 2579 (1975).  Reasonableness

allows leeway for officers to act on less than probable cause when

specific and articulable facts raise safety concerns.  Reasonable-

ness does not, however, surrender personal security to arbitrary

interference by police officers.  Mimms, 434 U.S. at 109, 54 L. Ed.

2d at 336, 98 S. Ct. at 332, citing Brignoni-Ponce, 422 U.S. at

878, 45 L. Ed. 2d at 614-15, 95 S. Ct. at 2579.                   

     This case presents a number of exceptional circumstances,

uncommon to other cases where traffic stops evolved into reasonable

protective searches.  We emphasize that a proper analysis of a

protective search necessitates a Brignoni-Ponce assessment of the

"reasonableness in all the circumstances" involved.               

     One circumstance sets this case apart from other cases that

have validated protective searches made in the course of traffic

stops.  This was a pretextual stop.  We know that the officers

stopped the van motivated by a desire to search it.  The officers

recognized that their information did not afford a reasonable basis

to arrest or search.  They therefore refrained from stopping the

van until they detected a traffic offense.  Thereafter, their

actions were calculated to develop a legal reason to support a

search.

     The officers' subjective intent in a pretextual setting cannot

make otherwise lawful conduct illegal.  It cannot invalidate the

stop.  It is not, however, totally irrelevant to questions that

accompany a pretextual stop.  A pretextual stop, by definition,

harbors an underlying ambition to exceed its original scope.  Once

a traffic stop's pretextual nature is established, as it was in

this case, we know that the true objective is to find a legal

excuse to accomplish a warrantless search.  This goal exposes to

careful scrutiny disputes over ensuing events.                 

     The Carbondale police might have executed the pretextual stop

under circumstances more favorable to the argument that officer

safety justified the search.  The general conditions surrounding

the stop do not favor the use of safety concerns as a justification

for the officers' desired agenda.  In Michigan v. Long, relied upon

by the State in support of its position, the Supreme Court analyzed

a protective search accompanying a traffic stop.  The Michigan

officers acted upon observation of a knife inside Long's vehicle. 

In concluding that the protective search was justified, the Court

noted the following circumstances: 

     "The hour was late and the area rural.  Long was driving

     his automobile at excessive speed, and his car swerved

     into a ditch.  The officers had to repeat their questions

     to Long, who appeared to be `under the influence' of some

     intoxicant.  Long was not frisked until the officers

     observed that there was a large knife in the interior of

     the car into which Long was about to reenter."  Long, 463

     U.S. at 1050, 77 L. Ed. 2d at 1220, 103 S. Ct. at 3481. 

     The Thompsons were stopped on the parking lot of an AutoZone

store in Carbondale.  It was a Sunday afternoon, and Mary Thompson

was seated inside the van with a 10-year-old member of the Thompson

family.  The stop was not generated in response to egregious

conduct.  It was generated to find some reason to act upon an

unreliable report and search the van.  It was the second stop by

the same department for the same offense in less than 24 hours. 

The first stop was accompanied by a complete search that proved the

van to be free of weapons, save the machete knife which was

returned.  The officers knew of the previous search of the van. 

The officer who conducted the challenged search repeatedly

announced a "need to search," before any observations giving rise

to safety concerns could be claimed.  This same officer also

conducted an unwarranted search of Larry Thompson prior to any

observations from which safety concerns could be formed.          

     There is one additional circumstance atypical to most

protective searches made in the course of traffic stops.  The

officer released the traffic offender.  He allowed the offender to

leave the scene of the stop.  He then focused on the passenger

seated in the van, not because of any violation of the law or

safety concern, but because of his unreliable anonymous information

about the van.  Stearns' own testimony assigns his information

about the van as the sole motivation for approaching Mary Thompson. 

Stearns' testimony also belies a reaction to the observations he

made on approach to the van.  He did not immediately remove Mary

Thompson from the van and frisk her.  Rather, he explained the

telephone call and expressed a need to search the van because of

it.   

     Although these circumstances all enter into analysis of the

reasonableness of the search, they do not necessarily outweigh one

circumstance focal to the question.  Stearns may not have been

concerned over safety in the initial phase of his encounter with

Mary Thompson.  In fact, there was very little upon which a concern

could be based.  A woman rummaging through her handbag while seated

in a vehicle awaiting her husband is not necessarily an activity

expected to strike fear in the heart of a police sergeant surround-

ed by three backup officers.  This is particularly true on a Sunday

afternoon at the AutoZone store with her 10-year-old child seated

behind her. 

     However, Stearns' claim that Mary Thompson continued to reach

into the bag as she exited the van is a circumstance capable of

causing legitimate safety concerns.  Such an act, coupled with her

demeanor over another search of the van, could rightfully target

the handbag for a precautionary search.  The Constitution would not

restrain Stearns from preempting her potential retrieval of a

weapon from the bag under such circumstance.                    

     Stearns may well have developed a reasonable belief that Mary

Thompson posed a threat to officer safety because of her persistent

access to the contents of her handbag.  This belief may well have

been justified despite other circumstances that mitigated against

it.  Mary Thompson claims that she did not engage in such activity. 

In fact, she claims that Sergeant Stearns asked for her permission

to search and pulled her from the van when he did not receive it. 

Obviously, this factual dispute needs to be resolved.             

     Ultimately, the question turns on what Sergeant Stearns

reasonably believed.  The reasonableness of his belief must be

weighed in light of all of the circumstances presented.  If he

reasonably believed that he was in potential peril, the law allows

a limited protective search to assure against it.  Such a determi-

nation, however, necessitates resolution of certain facts that were

left unsettled after the original hearing.   

     Accordingly, we reverse and remand this case to the trial

court for further proceedings consistent with this opinion.       

     Reversed and remanded.

     GOLDENHERSH, J. concurs.

     JUSTICE RARICK, dissenting:

     While I concur with the majority's ultimate resolution

regarding the pretextual traffic stop, I cannot agree with the

conclusion questioning the probable cause to search Mary Thompson's

"handbag."  When the officer approached the vehicle to talk to the

driver, the officer spotted in plain view two open cups of amber-

colored liquid between the two front seats and an unsheathed

machete lying on the floor of the passenger side.  The female

passenger appeared to be stuffing something into a duffle bag which

was sitting on top of the machete.  At this point the officer

justifiably believed that there was support for the anonymous tip

and that the female was engaged in furtive movement and suspicious

conduct.  Such known facts justified a search of both Mary Thompson

and the duffle bag she refused to relinquish.  See Michigan v.

Long, 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983);

People v. Day, 202 Ill. App. 3d 536, 560 N.E.2d 482 (1990).  I

therefore see no reason to remand this cause for further proceed-

ings on the issue of the search of Mary Thompson and her "handbag."

                                      ATTACH A FRONT SHEET TO EACH CASE

___________________________________________________________________________

                                 NO. 5-95-0425

                                     IN THE

                          APPELLATE COURT OF ILLINOIS

                                 FIFTH DISTRICT

___________________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS,)  Appeal from the

                                    )  Circuit Court of

     Plaintiff-Appellant,           )  Jackson County.

                                    )

v.                                  )  No. 94-CF-406

                                    )

LARRY THOMPSON and MARY THOMPSON,   )  Honorable

                                    )  David W. Watt, Jr.,

     Defendants-Appellees.          )  Judge, presiding.

___________________________________________________________________________

Opinion Filed:                 September 10, 1996

___________________________________________________________________________

Justices:      Honorable Clyde L. Kuehn, J.

                         

               Honorable Richard P. Goldenhersh, J.,

               Concurs

 

               Honorable Philip J. Rarick, J.,

               Dissenting

___________________________________________________________________________

                         

Attorneys      Michael Wepsiec, State's Attorney, Jackson County 

for            Courthouse, Murphysboro, IL 62966;

Appellant      

               Norbert J. Goetten, Director, Robert J. Biderman, Deputy

               Director, Timothy J. Londrigan, Staff Attorney, State's

               Attorneys Appellate Prosecutor, 725 South Second Street,

               Springfield, IL 62704

___________________________________________________________________________

Attorneys      Daniel M. Kirwan, Deputy Defender, Lawrence J. O'Neill,

for            Assistant Defender, Office of the State Appellate Defender,

Appellee       Fifth Judicial District, Route 15 East, P.O. Box 2430, Mt.

               Vernon, IL 62864

___________________________________________________________________________