# PENNSYLVANIA *v.* MIMMS

No. 76–1830.   Decided December 5, 1977

PER CURIAM.

Petitioner Commonwealth seeks review of a judgment of the Supreme Court of Pennsylvania reversing respondent's conviction for carrying a concealed deadly weapon and a firearm without a license. That court reversed the conviction because it held that respondent's "revolver was seized in a

manner which violated the Fourth Amendment to the Con-
stitution of the United States." 471 Pa. 546, 548, 370 A. 2d
1157, 1158 (1977). Because we disagree with this conclusion,
we grant the Commonwealth's petition for certiorari and re-
verse the judgment of the Supreme Court of Pennsylvania.

The facts are not in dispute. While on routine patrol, two
Philadelphia police officers observed respondent Harry Mimms
driving an automobile with an expired license plate. The
officers stopped the vehicle for the purpose of issuing a traffic
summons. One of the officers approached and asked respond-
ent to step out of the car and produce his owner's card and
operator's license. Respondent alighted, whereupon the officer
noticed a large bulge under respondent's sports jacket. Fear-
ing that the bulge might be a weapon, the officer frisked
respondent and discovered in his waistband a .38-caliber
revolver loaded with five rounds of ammunition. The other
occupant of the car was carrying a .32-caliber revolver.
Respondent was immediately arrested and subsequently
indicted for carrying a concealed deadly weapon and for
unlawfully carrying a firearm without a license. His motion
to suppress the revolver was denied; and, after a trial at which
the revolver was introduced into evidence, respondent was
convicted on both counts.

As previously indicated, the Supreme Court of Pennsylva-
nia reversed respondent's conviction, however, holding that
the revolver should have been suppressed because it was seized
contrary to the guarantees contained in the Fourth and Four-
teenth Amendments to the United States Constitution.[1] The
Pennsylvania court did not doubt that the officers acted rea-
sonably in stopping the car. It was also willing to assume,
*arguendo,* that the limited search for weapons was proper once
the officer observed the bulge under respondent's coat. But
the court nonetheless thought the search constitutionally in-

---

[1] Three judges dissented on the federal constitutional issue.

firm because the officer's order to respondent to get out of the car was an impermissible "seizure." This was so because the officer could not point to "objective observable facts to support a suspicion that criminal activity was afoot or that the occupants of the vehicle posed a threat to police safety." [2] Since this unconstitutional intrusion led directly to observance of the bulge and to the subsequent "pat down," the revolver was the fruit of an unconstitutional search, and, in the view of the Supreme Court of Pennsylvania, should have been suppressed.

We do not agree with this conclusion.[3] The touchstone of

[2] 471 Pa., at 552, 370 A. 2d, at 1160.

[3] We note that in his brief in opposition to a grant of certiorari respondent contends that this case is moot because he has already completed the 3-year maximum of the 1½- to 3-year sentence imposed. The case has, he argues, terminated against him for all purposes and for all time regardless of this Court's disposition of the matter. See *St. Pierre* v. *United States*, 319 U. S. 41 (1943).

But cases such as *Sibron* v. *New York*, 392 U. S. 40, 53–57 (1968); *Street* v. *New York*, 394 U. S. 576 (1969); *Carafas* v. *LaVallee*, 391 U. S. 234 (1968); and *Ginsberg* v. *New York*, 390 U. S. 629 (1968), bear witness to the fact that this Court has long since departed from the rule announced in *St. Pierre, supra.* These more recent cases have held that the possibility of a criminal defendant's suffering "collateral legal consequences" from a sentence already served permits him to have his claims reviewed here on the merits. If the prospect of the State's visiting such collateral consequences on a criminal defendant who has served his sentence is a sufficient burden as to enable him to seek reversal of a decision affirming his conviction, the prospect of the State's inability to impose such a burden following a reversal of the conviction of a criminal defendant in its own courts must likewise be sufficient to enable the State to obtain review of its claims on the merits here. In any future state criminal proceedings against respondent, this conviction may be relevant to setting bail and length of sentence, and to the availability of probation. 18 Pa. Cons. Stat. Ann. §§ 1321, 1322, 1331, 1332 (Purdon Supp. 1977); Pa. Rule Crim. Proc. 4004. In view of the fact that respondent, having fully served his state sentence, is presently incarcerated in the federal penitentiary at Lewisburg, Pa., we cannot say that such considerations are unduly specula-

our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry* v. *Ohio,* 392 U. S. 1, 19 (1968). Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975).

In this case, unlike *Terry* v. *Ohio,* there is no question about the propriety of the initial restrictions on respondent's freedom of movement. Respondent was driving an automobile with expired license tags in violation of the Pennsylvania Motor Vehicle Code.[4] Deferring for a moment the legality of the "frisk" once the bulge had been observed, we need presently deal only with the narrow question of whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment. This inquiry must therefore focus not on the intrusion resulting from the request to stop the vehicle or from the later "pat down," but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped.

Placing the question in this narrowed frame, we look first to that side of the balance which bears the officer's interest in taking the action that he did. The State freely concedes the officer had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior. It was apparently

_____

tive even if a determination of mootness depended on a case-by-case analysis.

[4] Operating an improperly licensed motor vehicle was at the time of the incident covered by 1959 Pa. Laws, No. 32, which was found in Pa. Stat. Ann., Tit. 75, § 511 (a) (Purdon 1971), and has been repealed by 1976 Pa. Laws, No. 81, § 7, effective July 1, 1977. This offense now appears to be covered by 75 Pa. Cons. Stat. Ann. §§ 1301, 1302 (Purdon 1977).

his practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation. The State argues that this practice was adopted as a precautionary measure to afford a degree of protection to the officer and that it may be justified on that ground. Establishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault.[5]

We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty. "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry* v. *Ohio, supra,* at 23. And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. "According-ing to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L. C. & P. S. 93 (1963)." *Adams* v. *Williams,* 407 U. S. 143, 148 n. 3 (1972). We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. *United States* v. *Robinson,* 414 U. S. 218, 234 (1973). Indeed, it appears "that a sig-nificant percentage of murders of police officers occurs when the officers are making traffic stops." *Id.,* at 234 n. 5.

---

[5] The State does not, and need not, go so far as to suggest that an officer may frisk the occupants of any car stopped for a traffic violation. Rather, it only argues that it is permissible to order the driver out of the car. In this particular case, argues the State, once the driver alighted, the officer had independent reason to suspect criminal activity and present danger and it was upon this basis, and not the mere fact that respondent had committed a traffic violation, that he conducted the search.

The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may also be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both.

Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as *de minimis*. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a " 'petty indignity.' " *Terry* v. *Ohio, supra,* at 17. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.[6]

There remains the second question of the propriety of the search once the bulge in the jacket was observed. We have as little doubt on this point as on the first; the answer is controlled by *Terry* v. *Ohio, supra.* In that case we thought the officer justified in conducting a limited search for weapons

---

[6] Contrary to the suggestion in the dissent of our Brother STEVENS, *post,* at 122, we do not hold today that "whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car." We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.

once he had reasonably concluded that the person whom he had legitimately stopped might be armed and presently dangerous. Under the standard enunciated in that case— whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate" [7]—there is little question the officer was justified. The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of "reasonable caution" would likely have conducted the "pat down."

Respondent's motion to proceed *in forma pauperis* is granted. The petition for writ of certiorari is granted, the judgment of the Supreme Court of Pennsylvania is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, dissenting.

I join my Brother STEVENS' dissenting opinion, but I write separately to emphasize the extent to which the Court today departs from the teachings of *Terry* v. *Ohio*, 392 U. S. 1 (1968).

In *Terry* the policeman who detained and "frisked" the petitioner had for 30 years been patrolling the area in downtown Cleveland where the incident occurred. His experience led him to watch petitioner and a companion carefully, for a long period of time, as they individually and repeatedly looked into a store window and then conferred together. Suspecting that the two men might be "casing" the store for a "stickup" and that they might have guns, the officer followed them as they walked away and joined a third man with whom they had earlier conferred. At this point the officer approached the men and asked for their names. When they "mumbled something" in response, the officer grabbed petitioner, spun

---

[7] 392 U. S., at 21–22.

him around to face the other two, and "patted down" his clothing. This frisk led to discovery of a pistol and to petitioner's subsequent weapons conviction. *Id.*, at 5–7.

The "stop and frisk" in *Terry* was thus justified by the probability, not only that a crime was about to be committed, but also that the crime "would be likely to involve the use of weapons." *Id.*, at 28. The Court confined its holding to situations in which the officer believes that "the persons with whom he is dealing may be armed and presently dangerous" and "fear[s] for his own or others' safety." *Id.*, at 30. Such a situation was held to be present in *Adams* v. *Williams*, 407 U. S. 143 (1972), which involved a person who "was reported to be carrying . . . a concealed weapon." *Id.*, at 147; see *id.*, at 146, 148.

In the instant case, the officer did not have even the slightest hint, prior to ordering respondent out of the car, that respondent might have a gun. As the Court notes, *ante*, at 109, "the officer had no reason to suspect foul play." The car was stopped for the most routine of police procedures, the issuance of a summons for an expired license plate. Yet the Court holds that, once the officer had made this routine stop, he was justified in imposing the additional intrusion of ordering respondent out of the car, regardless of whether there was any individualized reason to fear respondent.

Such a result cannot be explained by *Terry*, which limited the nature of the intrusion by reference to the reason for the stop. The Court held that "the officer's action [must be] reasonably related in scope to the circumstances which justified the interference in the first place." 392 U. S., at 20.[1] In *Terry* there was an obvious connection, emphasized by the Court, *id.*, at 28–30, between the officer's suspicion that an armed robbery was being planned and his frisk for weapons.

---

[1] See also 392 U. S., at 19 ("[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible"); *id.*, at 29–30.

In the instant case "the circumstance . . . which justified the interference in the first place" was an expired license plate. There is simply no relation at all between that circumstance and the order to step out of the car.

The institutional aspects of the Court's decision trouble me as much as does the Court's substantive result. The Court extends *Terry*'s expressly narrow holding, see *id.*, at 30, solely on the basis of certiorari papers, and in the process summarily reverses the considered judgment of Pennsylvania's highest court. Such a disposition cannot engender respect for the work of this Court.[2] That we are deciding such an important issue by "reach[ing] out" in a case that "barely escapes mootness," as noted by MR. JUSTICE STEVENS, *post,* at 117, 116 n. 4, and that may well be resolved against the State on remand in any event,[3] simply reinforces my view that the Court does

---

[2] Professor Ernest Brown wrote nearly 20 years ago:

"[S]ummary reversal on certiorari papers appears in many cases to raise serious question whether there has not been decision without that hearing usually thought due from judicial tribunals. . . . [T]here [is] the question whether the Court does not pay a disproportionate price in public regard when it defeats counsel's reasonable expectation of a hearing, based upon the Court's own rules. If the Court exercises its certiorari jurisdiction to deal with problems of national legal significance, it hardly needs demonstration that such matters warrant hearing on the merits." The Supreme Court 1957 Term—Foreword: Process of Law, 72 Harv. L. Rev. 77, 80, 82 (1958).

See also R. Stern & E. Gressman, Supreme Court Practice § 5.12 (4th ed. 1969). MR. JUSTICE BRENNAN has singled out cases from the state courts as ones where we should be particularly reluctant to reverse summarily. State Court Decisions and the Supreme Court, 31 Pa. Bar Assn. Q. 393, 403 (1960).

[3] On remand the Pennsylvania Supreme Court will have open to it the option of reaching the same result that it originally reached, but doing so under its state counterpart of the Fourth Amendment, Pa. Const., Art. 1, § 8, rather than under the Federal Constitution. A disposition on such an independent and adequate state ground is not, and could not be, in any way foreclosed by this Court's decision today, nor could this Court review a decision of this nature. See generally Brennan, State Constitutions and

institutional as well as doctrinal damage by the course it pursues today. I dissent.

Mr. Justice Stevens, with whom Mr. Justice Brennan and Mr. Justice Marshall join, dissenting.

Almost 10 years ago in *Terry* v. *Ohio*, 392 U. S. 1, the Court held that "probable cause" was not required to justify every seizure of the person by a police officer. That case was decided after six months of deliberation following full argument and unusually elaborate briefing.[1] The approval in *Terry* of a lesser standard for certain limited situations represented a major development in Fourth Amendment jurisprudence.

Today, without argument, the Court adopts still another—

---

the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977); Project Report: Toward an Activist Role for State Bills of Rights, 8 Harv. Civ. Rights-Civ. Lib. L. Rev. 271 (1973).

In addition, respondent's conviction may be reversed on a ground entirely unrelated to the search at issue here. At trial the prosecutor questioned a defense witness about respondent's religious affiliation, a matter not raised on direct examination of the witness. Two concurring justices of the Pennsylvania Supreme Court contended that this questioning provided an independent reason for reversing respondent's conviction under Pennsylvania law. 471 Pa. 546, 556–557, 370 A. 2d 1157, 1162–1163 (1977) (Nix, J., joined by O'Brien, J., concurring).

[1] Briefs of *amici curiae*, urging reversal, were filed by Jack Greenberg, James M. Nabrit III, Michael Meltsner, Melvyn Zarr, and Anthony G. Amsterdam for the NAACP Legal Defense and Educational Fund, Inc., and by Bernard A. Berkman, Melvin L. Wulf, and Alan H. Levine for the American Civil Liberties Union et al.

Briefs of *amici curiae*, urging affirmance, were filed by Solicitor General Griswold, Assistant Attorney General Vinson, Ralph S. Spritzer, Beatrice Rosenberg, and Mervyn Hamburg for the United States; by Louis J. Lefkowitz, *pro se*, Samuel A. Hirshowitz, First Assistant Attorney General, and Maria L. Marcus and Brenda Soloff, Assistant Attorneys General, for the Attorney General of New York; by Charles Moylan, Jr., Evelle J. Younger, and Harry Wood for the National District Attorneys' Assn.; and by James R. Thompson for Americans for Effective Law Enforcement. See 392 U. S., at 4.

and even lesser—standard of justification for a major category of police seizures.[2]   More importantly, it appears to abandon "the central teaching of this Court's Fourth Amendment jurisprudence"[3]—which has ordinarily required individualized inquiry into the particular facts justifying every police intrusion—in favor of a general rule covering countless situations. But what is most disturbing is the fact that this important innovation is announced almost casually, in the course of explaining the summary reversal of a decision the Court should not even bother to review.

Since Mimms has already served his sentence, the importance of reinstating his conviction is minimal at best.[4]   Even if the Pennsylvania Supreme Court has afforded him greater protection than is required by the Federal Constitution, the conviction may be invalid under state law.[5]   Moreover, the

---

[2] The Court does not dispute, nor do I, that ordering Mimms out of his car was a seizure. A seizure occurs whenever an "officer, by means of physical force or show of authority, . . . in some way restrain[s] the liberty of a citizen . . . ." *Id.*, at 19 n. 16.   See also *Adams* v. *Williams*, 407 U. S. 143, 146.

[3] In *Terry*, the Court made it clear that the reasonableness of a search is to be determined by an inquiry into the facts of each case:

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U. S., at 21.

In a footnote, the Court continued:

"This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." *Id.*, at 21 n. 18 (citing a long list of authorities).

[4] For the reasons stated in n. 3 of the Court's opinion, I agree that the case is not moot.   Nevertheless, the fact that the case barely escapes mootness supports the conclusion that certiorari should be denied.

[5] Two members of the court were persuaded that introducing testimony about Mimms' Muslim religious beliefs was prejudicial error, and three others specifically reserved the issue.   471 Pa. 546, 555 n. 2, and 556–557, 370 A. 2d 1157, 1158 n. 2, and 1162–1163.

Pennsylvania Supreme Court may still construe its own constitution to prohibit what it described as the "indiscriminate procedure" of ordering all traffic offenders out of their vehicles. 471 Pa. 546, 553, 370 A. 2d 1157, 1161.[6]  In all events, whatever error the state court has committed affects only the Commonwealth of Pennsylvania.  Its decision creates no conflict requiring resolution by this Court on a national level.  In most cases, these considerations would cause us to deny certiorari.

No doubt it is a legitimate concern about the safety of police officers throughout the Nation that prompts the Court to give this case such expeditious treatment.  I share that concern and am acutely aware that almost every decision of this Court holding that an individual's Fourth Amendment rights have been invaded makes law enforcement somewhat more difficult and hazardous.  That, however, is not a sufficient reason for this Court to reach out to decide every new Fourth Amendment issue as promptly as possible.  In this area of constitutional adjudication, as in all others, it is of paramount importance that the Court have the benefit of differing judicial evaluations of an issue before it is finally resolved on a nationwide basis.

This case illustrates two ways in which haste can introduce a new element of confusion into an already complex set of rules.  First, the Court has based its legal ruling on a factual assumption about police safety that is dubious at best; second, the Court has created an entirely new legal standard of justification for intrusions on the liberty of the citizen.

Without any attempt to differentiate among the multitude of varying situations in which an officer may approach a person

---

[6] Cf. *State* v. *Opperman,* 89 S. D. 25, 228 N. W. 2d 152 (1975), rev'd, 428 U. S. 364, judgment reinstated under state constitution, —— S. D. ——, 247 N. W. 2d 673 (1976).

seated in an automobile, the Court characterizes the officer's risk as "inordinate" on the basis of this statement:

> " 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L. C. & P. S. 93 (1963).' *Adams* v. *Williams*, 407 U. S. 143, 148 n. 3 (1972)." *Ante*, at 110.

That statement does not fairly characterize the study to which it refers. Moreover, the study does not indicate that police officers can minimize the risk of being shot by ordering drivers stopped for routine traffic violations out of their cars. The study reviewed 110 selected police shootings that occurred in 1959, 1960, and 1961.[7] In 35 of those cases, "officers were attempting to investigate, control, or pursue suspects who were in automobiles."[8] Within the group of 35 cases, there were examples of officers who "were shot through the windshield or car body while their vehicle was moving"; examples in which "the officer was shot while dismounting from his vehicle or while approaching the suspect[']s vehicle"; and, apparently, instances in which the officer was shot by a passenger in the vehicle. Bristow, *supra*, n. 7, at 93.

In only 28 of the 35 cases was the location of the suspect who shot the officer verified. In 12 of those cases the suspect was seated behind the wheel of the car, but that figure seems to include cases in which the shooting occurred before the officer had an opportunity to order the suspect to get out. In

---

[7] As the author pointed out, "[n]o attempt was made to obtain a random selection of these cases, as they were extremely hard to collect." Bristow, Police Officer Shootings—A Tactical Evaluation, 54 J. Crim. L. C. & P. S. 93 (1963).

[8] *Ibid.* Since 35 is 32% of 110, presumably this is the basis for the "30%" figure used in the Court's statement. As the text indicates, however, not all of these cases involved police officers approaching a parked vehicle. Whether any of the incidents involved routine traffic offenses, such as driving with an expired license tag, is not indicated in the study.

nine cases the suspect was outside the car talking to the officer when the shooting occurred.

These figures tell us very little about the risk associated with the routine traffic stop;[9] and they lend no support to the Court's assumption that ordering the routine traffic offender out of his car significantly enhances the officer's safety. Arguably, such an order could actually aggravate the officer's danger because the fear of a search might cause a serious offender to take desperate action that would be unnecessary if he remained in the vehicle while being ticketed. Whatever the reason, it is significant that some experts in this area of human behavior strongly recommend that the police officer "never allow the violator to get out of the car . . . ."[10]

Obviously, it is not my purpose to express an opinion on the

---

[9] Over the past 10 years, more than 1,000 police officers have been murdered. FBI, Uniform Crime Reports 289 (1976). Approximately 10% of those killings, or about 11 each year, occurred during "traffic pursuits and stops," but it is not clear how many of those pursuits and stops involved offenses such as reckless or high-speed driving, rather than offenses such as driving on an expired license, or how often the shootings could have been avoided by ordering the driver to dismount.

[10] "2. *Never allow the violator to get out of the car* and stand to its left. If he does get out, which should be avoided, walk him to the rear and right side of the car. Quite obviously this is a much safer area to conduct a conversation." V. Folley, Police Patrol Techniques and Tactics 95 (1973) (emphasis in original).

Another authority is even more explicit:

"The officer should stand slightly to the rear of the front door and doorpost. This will prevent the violator from suddenly opening the door and striking the officer. In order to thoroughly protect himself as much as possible, the officer should reach with his weak hand and push the lock button down if the window is open. This will give an indication to the driver that he is to remain inside the vehicle. It will also force the driver to turn his head to talk with the officer.

"The officer should advise the violator why he was stopped and then explain what action the officer intends to take, whether it is a verbal or written warning, or a written citation. If the suspect attempts to exit his vehicle, the officer should push the door closed, lock it, if possible, and

safest procedure to be followed in making traffic arrests or to imply that the arresting officer faces no significant hazard, even in the apparently routine situation. I do submit, however, that no matter how hard we try we cannot totally eliminate the danger associated with law enforcement, and that, before adopting a nationwide rule, we should give further consideration to the infinite variety of situations in which today's holding may be applied.

The Court cannot seriously believe that the risk to the arresting officer is so universal that his safety is *always* a reasonable justification for ordering a driver out of his car. The commuter on his way home to dinner, the parent driving children to school, the tourist circling the Capitol, or the family on a Sunday afternoon outing hardly pose the same threat as a driver curbed after a high-speed chase through a high-crime area late at night. Nor is it universally true that the driver's interest in remaining in the car is negligible. A woman stopped at night may fear for her own safety; a person

---

tell the driver to 'please stay in the car!' Then he should request [the] identification he desires and request the violator to hand the material out of the window away from the vehicle. The officer should not stare at the identification but [should] return to his vehicle by backing away from the suspect car. As the patrolman backs away, he should keep his eyes on the occupant(s).

"The officer should remain outside of the patrol unit to use the radio or to write a ticket. The recommended position for him at this time would be to the right side of the patrol unit. Should the driver of the violator vehicle make exit from his seat, the officer should direct the violator to the rear center of his vehicle or the front center area of the patrol unit. Preferably, the officer should verbally attempt to get the violator to re-enter and remain in the vehicle." A. Yount, Vehicle Stops Manual, Misdemeanor and Felony 2–3 (1976).

Conflicting advice is found in an earlier work, G. Payton, Patrol Procedure 298 (4th ed. 1971). It is worth noting that these authorities suggest that any danger to the officer from passing traffic may be greatly reduced by the simple and unintrusive expedient of parking the police car behind, and two or three feet to the left of, the offender's vehicle. Folley, *supra,* at 93; Payton, *supra,* at 301; Yount, *supra,* at 2.

in poor health may object to standing in the cold or rain; another who left home in haste to drive children or spouse to school or to the train may not be fully dressed; an elderly driver who presents no possible threat of violence may regard the police command as nothing more than an arrogant and unnecessary display of authority. Whether viewed from the standpoint of the officer's interest in his own safety, or of the citizen's interest in not being required to obey an arbitrary command, it is perfectly obvious that the millions of traffic stops that occur every year are not fungible.

Until today the law applicable to seizures of a person has required individualized inquiry into the reason for each intrusion, or some comparable guarantee against arbitrary harassment.[11] A factual demonstration of probable cause is required

---

[11] Government instrusions must be justified with particularity in all but a few narrowly cabined contexts. Inspections pursuant to a general regulatory scheme and stops at border checkpoints are the best known exceptions to the particularity requirement. And even these limited exceptions fit within a broader rule—that the general populace should never be subjected to seizures without some assurance that the intruding officials are acting under a carefully limited grant of discretion. Health and safety inspections may be conducted only if the inspectors obtain warrants, though the warrants may be broader than the ordinary search warrant; officials may not wander at large in the city, conducting inspections without reason. *Camara* v. *Municipal Court*, 387 U. S. 523. Similar assurances of regularity and fairness can be found in public, fixed checkpoints:

"[C]heckpoint operations both appear to and actually involve less discretionary enforcement activity [than stops by roving patrols]. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of

to justify an arrest; an articulable reason to suspect criminal activity and possible violence is needed to justify a stop and frisk. But to eliminate any requirement that an officer be able to explain the reasons for his actions signals an abandonment of effective judicial supervision of this kind of seizure and leaves police discretion utterly without limits. Some citizens will be subjected to this minor indignity while others—perhaps those with more expensive cars, or different bumper stickers, or different-colored skin—may escape it entirely.

The Court holds today that "third-class" seizures may be imposed without reason; how large this class of seizures may be or become we cannot yet know. Most narrowly, the Court has simply held that whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car. Because the balance of convenience and danger is no different for passengers in stopped cars, the Court's logic necessarily encompasses the passenger. This is true even though the passenger has committed no traffic offense. If the rule were limited to situations in which individualized inquiry identified a basis for concern in particular cases, then the character of the violation might justify different treatment of the driver and the passenger. But when the justification rests on nothing more than an assumption about the danger associated with every stop—no matter how trivial

individuals than . . . in the case of roving-patrol stops." *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 559.

There is, of course, a general rule authorizing searches incident to full custodial arrests, but in such cases an individualized determination of probable cause adequately justifies both the search and the seizure. In that situation, unlike this one, the intrusion on the citizen's liberty is "strictly circumscribed by the exigencies which justify its initiation." *Terry* v. *Ohio,* 392 U. S. 1, 26. In this case, there was no custodial arrest, and I assume (perhaps somewhat naively) that the offense which gave rise to the stop of Mimms' car would not have warranted a full custodial arrest without some additional justification. See *Gustafson* v. *Florida,* 414 U. S. 260, 266–267 (STEWART, J., concurring); *id.,* at 238 n. 2 (POWELL, J., concurring).

the offense—the new rule must apply to the passenger as well as to the driver.

If this new rule is truly predicated on a safety rationale—rather than a desire to permit pretextual searches—it should also justify a frisk for weapons, or at least an order directing the driver to lean on the hood of the car with legs and arms spread out. For unless such precautionary measures are also taken, the added safety—if any—in having the driver out of the car is of no value when a truly dangerous offender happens to be caught.[12]

I am not yet persuaded that the interest in police safety requires the adoption of a standard any more lenient than that permitted by *Terry* v. *Ohio*.[13] In this case the offense might well have gone undetected if respondent had not been ordered out of his car, but there is no reason to assume that he otherwise would have shot the officer. Indeed, there has been no showing of which I am aware that the *Terry* standard will not provide the police with a sufficient basis to take appropriate protective measures whenever there is any real basis for concern. When that concern does exist, they should be able to frisk a violator, but I question the need to eliminate the requirement of an articulable justification in each case and to authorize the indiscriminate invasion of the liberty of every citizen stopped for a traffic violation, no matter how petty.

Even if the Pennsylvania Supreme Court committed error, that is not a sufficient justification for the exercise of this

---

[12] *Terry* v. *Ohio, supra,* at 33 (Harlan, J., concurring):

"Just as a full search incident to a lawful arrest requires no additional justification, a limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet."

[13] I do not foreclose the possibility that full argument would convince me that the Court's analysis of the merits is correct. My limited experience has convinced me that one's initial impression of a novel issue is frequently different from his final evaluation.

Court's discretionary power to grant review, or for the summary disposition of a novel constitutional question. For this kind of disposition gives rise to an unacceptable risk of error and creates "the unfortunate impression that the Court is more interested in upholding the power of the State than in vindicating individual rights." *Idaho Dept. of Employment* v. *Smith, ante,* at 105 (STEVENS, J., dissenting in part).

I respectfully dissent from the grant of certiorari and from the decision on the merits without full argument and briefing.