OPINION
Defendant-appellant Timothy Alexander appeals from his conviction and sentence, following a no-contest plea, for Possession of Crack Cocaine. Alexander argues that the trial court erred when it denied his motion to suppress evidence. Alexander argues that the evidence was obtained as the result of an unlawful pat-down for weapons.
Although the issue is close, we conclude that the weapons pat-down was lawful. Accordingly, the judgment of the trial court is Affirmed.
 I
At about 11:30 p.m., one night in August, 1999, Alexander was one of two occupants of a car parked in the parking lot of a Holiday Inn in Moraine, Ohio. The car's lights were off, but the engine was running. Alexander was sitting in the driver's seat.
Moraine police officer Jessie Smith was patrolling the area because there had been a number of thefts of, and from, cars parked in that parking lot. Smith acknowledged that he never formed a suspicion that the car in which Alexander was sitting was stolen. In fact, it belonged to the other occupant of the car, who was sitting in the passenger's seat.
When Smith pulled up behind the car, Alexander looked back at Smith, then turned forward and rolled up his window. Smith became suspicious, got out of his cruiser, and approached the car on foot, intending to talk to Alexander. Smith described what happened next as follows:
Q. What did you do?
 A. I went up, I made contact with Timothy Alexander, who I did not have identified at that time. I began to talk to Mr. Alexander, asked him if he had had a room at the hotel.
 Q. Let me stop you. Which of the two people, the person that you now know to be Timothy?
 A. The person that was the driver of the vehicle is not the owner of the vehicle.
 Q. So you go up to the person that is in the driver's seat and what do you do?
 A. Ask — introduce myself, ask why they are here in the parking lot. Their response was they were just talking. When I approached the vehicle, the driver cracked the window down about a third of the way approximately that far (indicating) and I could — I could detect an extremely strong odor of marijuana coming from the vehicle.
 Q. Let me stop you. You did a hand motion a few minutes ago. About how many inches apart were your hands when you did the hand motion?
A. Say five. Five inches, approximately.
 Q. All right. And at that time that's when you smelled something, and what did you smell?
A. Marijuana.
 Q. All right. Could you tell from where in — where it was coming?
A. Just from the vehicle.
Q. What did you do upon smelling the marijuana?
 A. I continued my questioning. I didn't confront the operator about the smell that I had smelled. I wanted to talk to him and see what I could determine just by interviewing the subject.
Q. What kind of questions were you asking him?
A. Generalized questions, do you have a room here.
Q. What was the response?
 A. The response was delayed. Mr. Alexander turned towards the other passenger and kind of stuttered and then responded yes.
Q. What was your next question?
 A. Whose vehicle is this. Again, he kind of paused and he replied after looking towards the passenger.
 Q. What else did you ask him or what else did you do?
 A. I asked him if he had an identification card. He replied — he had verbally told me his name, Timothy Alexander. I asked him to provide an identification card. Mr. Alexander at that time offered to comply and he began to reach down towards his side and produce an identification card.
Q. Which side was he reaching down?
A. His left side.
 Q. Did anything strike you as unusual about that, or just describe the motions for the Court?
 A. When I had asked him for his identification card, he took his left hand between the door and his left leg and I could see all of his arm from here up (indicating) but I couldn't see his actual hand. It really didn't move. It wasn't the typical reach for the wallet move. His hand stayed down at the side for a considerable amount of time, approximately thirty seconds or so. That's quite a long time when I'm standing there.
 Q. Let me stop you. Now, you described or you showed a motion to the Court to show how much of the hand you could see. I need you to describe in words for the record how much of his arm, his left arm that you're describing that you could see and how much you could not see?
 A. I could visibly see approximately just above the wrist area up to the shoulder. Everything from the wrist down, I could not see what its actions were.
 Q. Okay. So what did you do after waiting approximately thirty seconds for him to produce some identification?
 A. I waited and once he stopped fumbling, doing whatever he was doing, he placed both his hands flat on both of his thighs and looked straight ahead and responded to me that he did not have his ID with him.
Q. What happened then?
 A. That made me wonder what was going on. I didn't have a positive identification on the subject, the smell of marijuana and sudden movements with his hands told me to have him remove himself from the vehicle and pat him down.
Q. How did you ask him to pat him down?
 A. I asked him to step out of the vehicle. He was very polite. He exited the vehicle. I notified him that I was going to pat him down for my safety.
Q. Why?
 A. His assertive movements, the fact that I didn't have an identification card to physically identify him and the strong smell of marijuana.
 Q. So where were you going to put him after you patted him down?
 A. I was going to place him in my vehicle until I could get a positive identification. There were two subjects. That's for safety purposes.
 Q. So you're taking him out of his car and then going to put him into the cruiser?
A. That's right.
After Smith had Alexander step out of his car, and before putting him in the police cruiser, Smith conducted a weapons pat-down. As a result of this pat-down, Smith found crack cocaine and a wad of money in excess of $1,200 on Alexander's person. Alexander was arrested and charged with Possession of Crack Cocaine.
Alexander moved to suppress the evidence obtained against him, contending that it was obtained as the result of an unlawful search. Following a suppression hearing, his motion to suppress was overruled. Thereafter, Alexander pled no contest, was found guilty, and was sentenced accordingly. From his conviction and sentence, Alexander appeals.
 II
Alexander's sole Assignment of Error is as follows:
 THE TRIAL COURT ERRED WHEN IT OVERRULED THE SUPPRESSION MOTION, BECAUSE THE OFFICER PAT SEARCHED APPELLANT ABSENT A REASONABLE SUSPICION THAT HE POSSESSED A WEAPON.
Alexander does not challenge the stop. He contends, instead, that Smith lacked a sufficient basis for concluding that he was armed, and was therefore not entitled to conduct a pat-down search for weapons.
The State relies upon three factors in support of Smith's conclusion that Alexander was likely to be armed. The first of these was the strong smell of marijuana coming from the vehicle. The second was Alexander's movements in response to the request for identification, which the State characterizes as furtive. The third factor was Alexander's failure to produce a driver's license or other form of identification.
Our review of the transcript of the suppression hearing suggests that the situation that developed as the result of Smith's observations was not as ominous as the State contends. Indeed, Smith's observations appear to us to be consistent with, and explainable by, having caught two men smoking marijuana in a parked car in a dimly-lit hotel parking lot. Although smoking marijuana is a criminal offense, it is not especially serious. There is nothing in the record to suggest that Alexander was a drug dealer.
Even when the criminal violation observed is merely a traffic violation, a police officer may order a motorist to get out of his car. Pennsylvania v. Mimms (1977), 434 U.S. 106, 98 S.Ct. 330,54 L.Ed.2d 331.
A Mimms order does not automatically bestow upon the police officer the authority to conduct a pat-down search for weapons. In analyzing the ensuing Terry [v. Ohio (1968), 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889] frisk, the question we must ask is whether, based on the totality of the circumstances, the officers had a reasonable, objective basis for frisking defendant after ordering him out of the car. See, State v. Andrews
(1991), 57 Ohio St.3d 86, 565 N.E.2d 1271. "The touchstone of our analysis under the Fourth Amendment is always `the reasonableness in all the circumstances of the particular governmental evasion of a citizen's personal security.'" Mimms,supra, 434 U.S. at 108-109, 98 S.Ct. at 332, 54 L.Ed.2d at 335, quoting Terry, supra, 392 U.S. at 19, 88 S.Ct. at 1878, 1879,20 L.Ed.2d at 904.
State v. Evans (1993), 67 Ohio St.3d 405, at 409.
The State cites State v. Taylor (1992), 82 Ohio App.3d 434, at 440, for the proposition that: "It is common knowledge that, in this day and age and in this area, drugs and weapons are frequently found in close proximity, especially in the city of Dayton; . . . ." The pat-down search for weapons in that case involved an individual who was found in a house from which it was known that cocaine was being sold.
In a more recent case, again involving an individual who had just come from a known heroin house, after a visit of a minute or a minute and a half, we upheld a pat-down search for weapons, reasoning as follows:
 It is common knowledge that the trafficking in drugs by the inhabitants of the under world drug culture has grown exponentially. Accordingly, safety concerns by law enforcement officials have also grown. We cannot ignore the obvious peril facing our officers who are on the front lines in the war against drugs. Even though we know that not all drugs traffickers, be they sellers or buyers and users, are armed and dangerous; yet, we also know that a significant percentage of them are, and the slight inconvenience of a pat-down is a small price to pay for attempting to insure the safety of the officers in the field.
 State v. Lindsey (June 23, 2000), Montgomery App. No. 18073, unreported, at 5.
In the case before us, the only drug violation for which Smith had a reasonable and articulable suspicion at the time of the pat-down search was the smoking of marijuana. This is admittedly a weaker basis upon which to conclude that a suspect is armed than was present in State v. Evans, supra, or State v.Taylor, supra.
However, the reasoning of the Ohio Supreme Court in State v.Evans, supra, is instructive. In that case, the Court upheld a pat-down search that was incident to the subject's failure to produce a driver's license, because the failure to produce the license meant that officers were going to have to put the subject in the back of the police cruiser, while his identification was being verified. The protective search was conducted because the officer conducting the search wanted to be sure that the subject did not possess a weapon while being detained in the patrol car.Id. at 409. The Court found it reasonable "that the officer, who has a legitimate reason to so detain that person, is interested in guarding against an ambush from the rear." Id., at 410.
It should be noted that in State v. Evans, supra, there were two police officers present at the scene, and, apparently, just one occupant of the stopped car. In the case before us, there was one police officer, with two occupants of the stopped car. Smith alluded to the fact that he was dealing with two occupants as a factor in his decision to separate them by asking Alexander to sit in the back seat of his cruiser.We understand the implication inState v. Evans, supra, to be that because of the heightened risk to which a police officer is exposed when a suspect is placed in the back seat of his cruiser, the requisite justification for a limited, pat-down search for weapons in that circumstance is minimal. Accordingly, although it is a close call, we conclude that the strong odor of marijuana, indicative of Alexander's use of marijuana, even if he was not buying or selling marijuana, justified Smith in conducting a limited pat-down search for weapons when he decided it was necessary to place Alexander in the back of his police cruiser to separate him from the other occupant of the car, while Alexander's identification was being verified.
Alexander's sole Assignment of Error is overruled.
 III _________________________ FAIN, J.
GRADY, P.J., and YOUNG, J., concur.