**UNITED STATES of America**

v.

**Stanley L. DUNHAM, Jr.**

**No. AMD 01–0106.**

United States District Court, D. Maryland.

Sept. 4, 2001.

Kathryn Frey Balter, Baltimore, MD, for defendant.

Lisa M. Griffin, Office of U.S. Attorney, Baltimore, MD, for U.S.

## MEMORANDUM

DAVIS, District Judge.

The two count indictment in this case charges Stanley Dunham, Jr., with possession of a firearm and possession of ammunition after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). The case arises from a traffic stop of Dunham and a subsequent pat down search of

his person. Dunham filed a timely motion to suppress all physical evidence and statements and the court held an evidentiary hearing on June 1, 13 and 14, 2001. The government presented the testimony of several law enforcement officers; Dunham and his girlfriend, who was present in the vehicle at the time of the stop and search, also testified. On the basis of the findings of fact and conclusions of law set forth herein, I shall grant the motion to suppress evidence.

## I. Findings of Fact

The events surrounding this case occurred on February 1, 2001, at about 1:30 a.m. Dunham was driving his girlfriend, Joella Cheatham, to her home located at 2909 Spelman Road in the Cherry Hill neighborhood of Baltimore City. Cherry Hill is a high crime area. Spelman Road runs north/south, but also curves in a southeasterly configuration. It is abutted by Denham Circle, which connects to Spelman at both ends. Cheatham's home at 2909 Spelman is located in the portion of Spelman running southeast.

Four uniformed police officers, Officers Nock, Hall, Reynolds and Wright, were present in the early morning hours of February 1, 2001, in the 2700 block of Spelman Road, and were making an arrest or providing backup for an officer making an arrest at 2705 Spelman. This arrest was unrelated to the ensuing events involving Dunham. Three police cruisers were also present in some configuration on the street. There may also have been a police van on the scene.

Dunham was initially traveling southbound on Spelman Road around the beginning portion of the 2700 block. Officer Reynolds testified that as he stood in the middle of Spelman facing south, he heard the sound of squealing tires and turned around and saw a grey Mercury on the road, and no other vehicles. According to Reynolds, the Mercury came toward him within the speed limit and in a lawful manner; the vehicle then proceeded past Reynolds's location and as it did so, Reynolds observed that the vehicle lacked a front license tag, which could have been a violation of Maryland law (state law requires, ordinarily, both a front and rear tag). Reynolds also claimed that Dunham was not wearing his seatbelt, a violation of Maryland law.

A principal contention of the defense here is based on the testimony of Dunham and Cheatham, each of whom denied that Dunham drove past the officers on Spelman Road, and therefore called into question whether Reynolds could have seen what he claims to have seen. They testified that the police activity near 2705 Spelman effectively blocked the road. Accordingly, Dunham asserted, he turned around, proceeded north on Spelman and arrived at 2909 Spelman Road by an alternate route. (According to the defense evidence, what Reynolds heard was the squeal of the worn out brake pads on the Mercury as Dunham did a turnabout in order to proceed away from—rather than pass—the officers' location).[1] I find that the government's version of the events preceding the traffic stop is no more plausible and credi-

---

1. Dunham and Cheatham testified that they took the following route: they turned around in a parking lot located near 2701 Spelman, proceeded north on Spelman, left on to Woodview Road, left on to Round Road, left on to Bridgeview, left on to Spelman Road, left on to Denham Circle, around Denham Circle, left on to Spelman, ending up on the right side of Spelman in front of Cheatham's home. Dunham testified that no matter what route he traveled to reach Cheatham's house, he always would take Denham Circle and make a left on to Spelman so that he would end up in front of Cheatham's house (passenger side to the curb) and then would proceed straight to his home directly on Spelman.

ble than the defense version. Consequently, I do not find that Dunham drove past the officers on Spelman Road, and I do not find that Reynolds observed Dunham operating his vehicle in violation of Maryland law in respect to the seatbelt violation.

In any event, it is not disputed that Dunham was making his way towards, and in fact did reach, 2909 Spelman. Dunham pulled his car to the right curb of Spelman as the vehicle faced northwest. He was pulling over to drop off Cheatham at 2909 Spelman. As he was pulling to the side of the road, officers Reynolds and Wright approached the driver's side of the Mercury.

Officer Wright [2] addressed Dunham as Officer Reynolds stood to his right "look-

---

**2.** Officer Wright was not available to testify when the government presented its case-in-chief because of a personal emergency involving his wife. Rather, Officer Reynolds was presented as the government's witness and he was permitted to present hearsay testimony. *See* Fed.R.Evid. 1101(d)(1). The suppression hearing could not be concluded on June 1, 2001, in part because the firearm had not been produced in court. After an extended colloquy with counsel concerning whether the government should be permitted to call Officer Wright as a rebuttal witness at the continued hearing, I reserved ruling on the issue and strongly admonished Officer Reynolds and the Assistant United States Attorney that, in light of the extraordinarily critical credibility issues generated by the evidence, they must not taint Officer Wright's testimony by discussing with him the events or testimony that had been entered in the record during the first day of the hearing. *See* Trans. at 109–116.

At the continued hearing on June 13, 2001, the government reiterated its request that it be permitted to call Officer Wright as a rebuttal witness. Trans. at 187. Defense counsel objected, however, arguing that

[R]ebuttal is limited to new evidence or new theories which are presented for the first time after the close of the government's case in chief—specifically, the defendant's case in chief. Rebuttal is not intended to let the government fix old theories. The questions about clothing-specifically, the jacket and the flightsuit—were introduced in no uncertain terms during the government's case-in-chief by the defendant during the cross-examination of Officer Reynolds. The government then had the opportunity to respond to the questions raised on cross-examination, by redirect or by putting on another witness or by cross-examination in the defense case. What the government seeks to do now is put on evidence that it should have put on in its case in chief.

Trans. at 189–190.

Defense counsel's interpretation of the law is indisputably correct. *See Allen v. Prince George's County*, 737 F.2d 1299, 1305 (4th Cir.1984)("Ordinarily, rebuttal evidence may be introduced only to counter new facts presented in the defendant's case in chief.")(internal citations omitted). Accordingly, at the continued hearing, I stated that "[i]t is absolutely clear that all of the matters that have been gone into in the course of the defense case are matters that the government *could have gone into, but chose not to go into, in its case in chief.*" Trans at 197. What clothing Dunham was wearing was central to the suppression determination. Specifically, whether Dunham wore a coat that made it unlikely that a bulge could be observed was crucial and vigorously contested. What Dunham was wearing had been addressed by the government in its case-in-chief on direct examination of Reynolds, *see* Trans. at 20, and in detail on defendant's cross-examination of Reynolds. *See* Trans. at 33, 34. The defense case-in-chief, specifically its demonstration, did not present new evidence or surprise the government.

Nevertheless, I was prepared to allow the government to present Wright as a "rebuttal witness" for the sole purpose of making a record in the event the government did not prevail on the suppression issues and elected to seek appellate review. I stated that I would not consider Wright's testimony in my determination of the issues. Trans. at 198. I instructed the Assistant United States Attorney in the clearest of terms that the "rebuttal testimony" would not include a replication of the demonstration, but that Officer Wright should be examined in a manner similar to the manner in which he would have been examined on direct examination in the government's case-in-chief. Trans. at 205. After

ing into the vehicle from the driver's side window." Trans. at 24. From that position, Reynolds could see Dunham's "shoulder area," hands and his left bicep, and some "movement" in relation to those parts of Dunham's body. Trans. at 26–27, 45–46. Wright directed Cheatham and Dunham to exit the car. They both exited on the passenger's side because the driver's side door was broken and would not fully open. Dunham raised the armrest in the center of the front seat and slid across the seat to exit the car on the passenger's side.

The temperature was around freezing. Dunham, who works as a mechanic, was wearing black denim jeans, a tee shirt, and a polo shirt. On top of this layer, Dunham wore a long-sleeved green flight suit, which is similar to a jumpsuit, and which zips up the front. He was also wearing a hooded windbreaker type jacket, having a synthetic outer covering and a lined fleece interior. The windbreaker extended approximately to Dunham's mid-thigh. I find, specifically, that the items of clothing admitted at the motions hearing in the demonstration of the events which occurred on February 1, 2001, are identical or substantially identical to those worn by Dunham on the morning of his arrest for the handgun violation. The gun was in Dunham's waistband, on the left side, with the handle facing toward his navel. Dunham is right handed.

Of enormous significance to my findings and conclusions in this case, Reynolds recalled the flightsuit and the layers of clothing beneath it, but he could not recall whether Dunham was wearing the windbreaker. Trans. at 34–35. After Dunham's arrest, Reynolds removed Dunham's driver's license from the back pocket of his jeans. Trans. at 20, 26.

Reynolds testified that while he stood on the driver's side of the car as Dunham exited the car, he heard Wright yell "gun." Reynolds ran around to the passenger side of the car to find Wright and other officers "taking down" Dunham. Trans. at 16. Reynolds testified that he stuck his hand in Dunham's jumpsuit, as the other officers held his arms up and were beginning to handcuff him, and pulled a ten millimeter Colt pistol from Dunham's waistband. Trans. at 16–17. After this testimony, Reynolds asked the court if he could "backtrack" for a moment, and he then went on to explain that he and Wright had seen a bulge (which he later described as "green") around Dunham's left waist area when they were both on the driver's side of the car and Dunham was still seated in the car. Trans. at 17, 55. Based on my assessment of all the evidence in the record, including the demeanor evidence of the witnesses and the demonstration of the manner in which Dunham exited the vehicle on the morning of February 1, 2001 (which demonstration I find substantially duplicated the manner and means by which he exited the car on the morning in question), I find, contrary to the sworn testimony of Officer Reynolds, that neither Reynolds, Wright nor any other law enforcement officer observed a "bulge" under Dunham's clothing while Dunham was in the vehicle or as Dunham slid or

---

Wright had been sworn, however, the Assistant United States Attorney blatantly ignored my instructions and immediately began her examination of Wright by asking Dunham to recreate the conditions of the demonstration. Trans. at 201. Thus, the government sought to present a "rebuttal" case on the suppression issues by first providing Wright with a key fact—that Dunham was wearing the black windbreaker at the time of the encounter— that was central to the merits of the suppression determination. In the face of the government's contumacious conduct, I immediately excused Wright; consequently, Wright's first-hand version of the events of February 1, 2001, is not in the record.

crawled across the front seat of the vehicle to exit the vehicle. Cheatham testified that she was searched after she exited the car. The government offered nothing to challenge this contention either on direct examination of the officers or in cross examination of Cheatham. There was no testimony that an observation was made of Cheatham that indicated that she was armed or posed a danger to the officers. Cheatham was not arrested.

I find that after Dunham slid over on the car seat to exit on the passenger side, Officer Wright grabbed him at his waist and spun him around and pulled his arms up, holding them back.[3] Wright then asked Dunham for permission to conduct a pat down search. While thus restrained, with his arms pinned back by Wright, Dunham replied "yes." Trans. at 88. I find that Dunham's consent to the pat down under the circumstances shown by the evidence was not voluntary in any sense of the word. Wright patted down Dunham two times. After feeling something hard on Dunham's left side around the waist area, following the pat down, Wright asked Dunham if what he felt was a gun. Trans. at 20. Dunham confirmed the presence of a gun. The gun was removed from the left side of Dunham's waist band. Trans. at 53 ("The gun was in his pants underneath the jumpsuit in his left hip."). Dunham was arrested for a handgun violation. Dunham's driver's license was found in his rear jeans pocket.

Dunham was issued citations for the following traffic violations: failure to have front tag on vehicle, failure to wear seatbelt, improperly squealing tires, failure to display license and registration upon de-mand, driving with a suspended license and driving without insurance.

## II. Conclusions of Law

█ Because no officer saw a bulge indicating the concealment of an instrument that could endanger the safety of himself or other officers, there did not exist a reasonable articulable suspicion to justify the frisk of Dunham on the authority of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To conduct such a search for weapons, an officer must have "reason to believe that the suspect is armed and dangerous." *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Given what Dunham was wearing that cold February morning, there is no way that the officers on the scene could have seen a "green bulge" or even a black bulge underneath his windbreaker and layers of clothing. This is especially true given that Dunham was seated in an automobile with the door closed when Reynolds testified that a bulge was observed by the officers.

█ To effect a lawful pat down search an officer must reasonably believe that the suspect is armed or poses a danger. *Terry*, 392 U. S at 27, 88 S.Ct. 1868. It is of course a truism that "[o]bserving a bulge that could be made by a weapon in the suspect's clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped only for a minor traffic violation." *U.S. v. Baker*, 78 F.3d 135, 137 (4th Cir.1996)(*citing Pennsylvania v. Mimms*, 434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)(per curiam)). Here, however, the government has not carried its burden in showing that a bulge was observed that

---

**3.** In *United States v. Hammond,* 2000 WL 1139611 (4th Cir., August 11, 2000) (unpublished), the Fourth Circuit remanded a case involving this same Officer Omar Wright for further fact finding in a situation where it was alleged that Officer Wright effected an arrest by grabbing the defendant where there existed no probable cause to arrest.

would create reasonable suspicion that Dunham was armed or posed a danger to the officers.[4] In this case, it cannot be said that the search for weapons on the person of Dunham was reasonable as a *Terry* frisk. While I am assuming that the stop of Dunham's car was valid under *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), because the vehicle lacked a front license tag, the government has not shown by a preponderance of the evidence that the pat down search of Dunham's person for weapons comported with constitutional requirements, i.e., the government has not shown by the applicable burden of proof that the search of Dunham's person was reasonable.

■ Whether a search or seizure is reasonable is evaluated based on an objective standard. *Terry*, 392 U.S. at 22, 88 S.Ct. 1868. The central inquiry is whether "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 21–22, 88 S.Ct. 1868. Without observing a bulge, there are no other facts related by the officers to indicate that Dunham was armed or dangerous. Certainly, the residents and motorists present in a high crime area such a Cherry Hill do not for that reason alone relinquish their constitutional rights to be free from unreasonable searches. The officers observed no conduct that would allow an inference that Dunham, dropping off his girlfriend in the wee hours of the night in front of her home, posed a threat to them or anyone else.

■ The government argues that Dunham consented to a search of his person. Dunham's consent to a pat down search, however, was not voluntary. Whether consent is voluntary must be determined after considering the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The court should consider the characteristics of the accused (age, maturity, education, intelligence, and experience) and the conditions under which consent to search was given (such as the officer's conduct, the number of officer's present, and the duration of the encounter). *See U.S. v. Lattimore*, 87 F.3d 647, 650 (4th Cir.1996).

In *Lattimore*, the request for consent to search a car was made after a citation for not wearing a seatbelt was issued and a warning for speeding was given. The officer asked for consent to search the vehicle as Lattimore was leaving the patrol car to return to his own vehicle and leave. The

---

4. I note that a demonstration was presented by the defense during the motion hearing. The demonstration was done twice, once with a "toy" weapon that approximated the size of the weapon seized from Dunham, and at the continued hearing, with the weapon actually seized from Dunham. I could not observe a bulge during either demonstration. Trans. at 100, 181.

The government conceded at the first demonstration that

[I]f the defendant were wearing the jacket, and if the gun were placed in the waistband the way he placed it there, with the handle facing towards his navel as opposed to facing backwards where it would stick out

more, and if the firearm weren't broken on the left side so that it is a considerably thinner handle than it otherwise would be, that under those altered circumstances, the bulge cannot be seen.

Trans. at 102. The statement was made during the first demonstration at which only a toy gun was available. There was some question at the first demonstration regarding the degree to which the toy weapon approximated the size of the seized weapon. When the weapon seized from Dunham was produced at the continued hearing, however, I determined that the "toy" gun closely resembled in size the gun seized from Dunham. Trans. at 167.

court emphasized that the request for consent to search was not made until "after the officer had issued the citations and returned Lattimore's driver's license, indicating that all business with Lattimore was completed and that he was free to leave." *Id.* at 653. Hence, the court held that the subsequent encounter was consensual as there was no further coercion or detention. *Id.*

■ While the officer's direction to Dunham to exit the car was valid under *Mimms,* 434 U.S. at 111, 98 S.Ct. 330 (assuming *arguendo* that the traffic stop was valid), the force applied to Dunham by Officer Wright when he stepped from the vehicle was not reasonable under the circumstances. *See Terry,* 392 U.S. at 28–29, 88 S.Ct. 1868 ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation."). The force Wright applied to Dunham—grabbing him and spinning him around and holding up his arms prior to requesting consent to do a pat down search—invalidates the consent; it was not a voluntary consent. *See Bustamonte,* 412 U.S. at 228, 93 S.Ct. 2041 (explaining that the application of force can invalidate consent). At that point, Dunham had been physically seized by Wright. Manifestly, a reasonable person *not holding a weapon or contraband* under such circumstances would not have withheld consent (indeed, he or she would not even had thought he or she had the option to withhold consent) to Officer Wright's *pro forma* request for permission to conduct a pat down search. *See Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

■ The evidence shows that Wright had effectively communicated to Dunham—by laying on his hands in an abrupt and forceful way without reasonable suspicion sufficient to justify such an intrusion—that his personal physical integrity was wholly under Wright's control. While it is true that consent can be voluntary even when an individual is in police custody, *see United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), or while he is detained based on reasonable suspicion, *see Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the force exerted upon Dunham prior to the request for consent to perform a pat down entirely deprived Dunham's subsequent consent (as it would have deprived any person's consent) of any voluntary character. Thus, it cannot be said that the government has proven by a preponderance of the evidence that Dunham validly consented to a pat down search of his person.

It is worth noting the anomaly of an officer *asking for consent to do a pat down search.* While there is no legal impediment to such a tack by a wily officer, under *Terry,* a pat down search is justified when an officer reasonably has concerns for his or her own safety or the safety of others and fears that the subject being confronted is armed. The concern with officer and public safety justifies this intrusion. Pat down searches under *Terry* are, to a degree, justified in the same way that searches based on exigent circumstances (requiring immediate and forthright action) can be justified without a warrant. To ask for consent to do a search that is normally justified when an officer imminently fears for his or her safety bespeaks a lack of reasonable articulable suspicion required to conduct such a search. The existence of the danger Dunham posed (not to say its immediacy) was belied by

the purported request for consent.[5]

■ The government made a belated argument that there existed an objective reason for arresting, and thus subsequently searching Dunham, which should persuade me to deny the motion to suppress even though it was never relied on by the officers at the scene or subsequently. *See* Trans. at 227. Specifically, the government argues that Dunham could have been arrested for failing to identity himself upon demand pursuant to Maryland Code Ann., Trans. § 26–202. Trans. at 227. This provision authorizes an arrest when a traffic violation has been committed in the presence of an officer and "the person does not furnish satisfactory evidence of identity." Maryland Code Ann., Trans. § 26–202(a)(2)(i). This argument is unavailing. The government has not proved by a preponderance of the evidence that Dunham was asked for and refused to tender his identification to the officers. Dunham had his driver's license in his pocket. This identification was viewed by officers on the scene. Trans. at 26. Thus, the government cannot plausibly argue that Dunham could have been arrested pursuant to this section of the Maryland Transportation Code; it does not appear that establishing his identity was an issue, *see Benbow v. State*, 322 Md. 394, 587 A.2d 1110, 1115 (1991), as his license was located and retrieved from his back pants pocket.

■ Maryland law permits an arrest when an officer has probable cause to believe that a motorist is operating a vehicle while his or her license is revoked or suspended. *See* Md.Code Ann., Trans. § 26–202(a)(3)(iv). Dunham's operating privilege had been suspended but the government, correctly, does not argue that Dun-

ham could have been arrested (and searched incident thereto) for operating a motor vehicle while his license was suspended. The standard for evaluating whether a stop or search is reasonable is an objective one. *See Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Before a search is conducted, however, officers must possess knowledge of facts or circumstances that would justify the *subsequent* conduct. Here, after searching and arresting Dunham[6] for possessing the weapon that was revealed in the *Terry* frisk, the officers located Dunham's driver's license in his back pocket. Shortly thereafter, it was discovered that the license had been suspended. Trans. at 20. The government cannot argue that a search incident to arrest would have been justified by information that was uncovered during the search that followed Dunham's arrest. "[A] search may not be justified by what turns up in the search." Wayne LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.2 (3rd ed.1996). Here, the government cannot assert that the officers could have conducted a search incident to arrest based on information recovered after Dunham had already been searched and arrested. *See United States v. DiRe*, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210 (1948)("[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success."), *abrogated on other grounds, Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960).

## III. Conclusion

The government has not proven by a preponderance of the evidence that during

---

5. Nor did the government refute or contradict Cheatham's testimony that she too, was searched.

6. Reynolds testified that at this time Dunham "was in cuffs [and] I told Mr. Dunham that he was going to jail...." Trans. at 19–20.

the traffic stop on February 1, 2001, the officers developed a reasonable suspicion that Dunham was armed or otherwise posed a threat of danger to anyone. Thus, the government failed to establish by a preponderance of the evidence that the pat down search of Dunham was a reasonable search under the *Terry* doctrine. In addition, the government has not proven by a preponderance of the evidence that the pat down search of Dunham's person was justified by his voluntary consent or that it was justified as a reasonable Fourth Amendment intrusion as a search incident to Dunham's arrest for a violation of the Maryland Motor Vehicle Code. Accordingly, the motion to suppress shall be granted. An order follows.