## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 09 2018, 8:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Caleb Bixler,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 9, 2018

Court of Appeals Cause No.
49A04-1712-CR-2847

Appeal from the Marion Superior Court

The Honorable Kurt Eisgruber, Judge

Trial Court No. 49G01-1508-MR-29145

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Caleb Bixler (Bixler), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1.

We affirm.

# ISSUES

Bixler presents two issues on appeal, which we restate as the following:

(1) Whether the trial court abused its discretion by admitting certain evidence; and

(2) Whether the State presented sufficient evidence beyond a reasonable doubt to sustain Bixler's murder conviction.

# FACTS AND PROCEDURAL HISTORY

In August of 2015, Bixler, Keith Cornwell (Cornwell), Ricky Ogden (Ogden), John Murphy (Murphy), and Ron Trahan (Trahan) were all residing in a two-story house located on the east side of Indianapolis, Indiana. Trahan occupied the downstairs bedroom. One of the two upstairs bedrooms was shared by Ogden and Murphy, while Cornwell and Bixler shared the other. Cornwell did not get along with Trahan, and in the past, they had engaged in verbal and physical altercations over rent, food, and keeping their home clean.

On August 13, 2015, at around 2:00 a.m., Bixler, Cornwell, and Trahan left the house together. At approximately 5:00 a.m., Bixler and Cornwell returned to

the house without Trahan. Murphy awoke and went out to speak to Cornwell and Bixler in the hallway. Cornwell narrated to Murphy a "frightening" event, inferring Trahan's murder. (Tr. Vol. IV, p. 52). Cornwell, Bixler, and Murphy, then obtained a "decent sized" lunch box and placed clothing items inside it which they planned to burn. (Tr. Vol. IV, p. 53). Before leaving the house, Murphy retrieved some gasoline used for the lawn mower, and Bixler held the spray bottle while Murphy filled the bottle with gasoline. Murphy tried to act "normal" and like nothing was wrong, but was terrified. (Tr. Vol. IV, p. 59).

[6] Shortly thereafter, Bixler, Murphy, and Cornwell left the house, and when Murphy asked Cornwell where they were headed, Cornwell explained that they were going to burn the clothes in the lunch box by the train tracks. When the three arrived at the train tracks, they doused the lunch box and set it on fire. As they watched the items burn, they sat down and each smoked a "Newport" brand cigarette offered by Murphy. (Tr. Vol. IV, p. 60). When they were done smoking, they discarded the cigarette butts on the ground, and Cornwell indicated to Bixler and Murphy that it was time to leave.

[7] The three began walking, and when Murphy asked where they were going, Cornwell stated that it "was a surprise." (Tr. Vol. IV, p. 61). Cornwell directed the men to an abandoned building which had several mulch piles in the parking lot. At some point, Bixler asked Cornwell and Murphy if they were bleeding, and after they stated that they were not, Bixler pointed to the "blood" on his "white socks" and expressed, "[I]t must be [Trahan's]." (Tr. Vol. IV, pp. 62, 63). After approximately thirty minutes, the men left the abandoned building

and walked back to their house. Murphy woke up later in the afternoon and called his father. Murphy's step-mother answered the phone, and Murphy left a message for his father.

[8] On August 14, 2015, at approximately 6:00 a.m., Bixler sent a text message to his friend Morgan Farfan (Farfan) stating, "[A]ye sis as soon as you wake up tell me I need to come over ASAP no joke!!" (State's Exh. 184 A). At around noon, Bixler went to Farfan's house and he placed a drawstring backpack on a high shelf. Bixler instructed Farfan to wash the clothes that were inside the backpack, and to place it back on a distant shelf. Farfan never washed the clothes.

[9] The next day, on August 15, 2015, Murphy's father paid Murphy a visit at the house. Murphy asked his father to take a walk with him, instead, Murphy's father instructed Murphy to get into his car. Murphy then directed his father to drive to the parking lot of an abandoned building. Murphy pointed to a mulch pile where he thought Trahan's body had been buried. At that point, Murphy's father called the police.

[10] Officer Sally Kirkpatrick (Officer Kirkpatrick) of the Indianapolis Metropolitan Police Department was first to arrive at the scene. Murphy pointed to a "pillow" of blood "not far from the mulch pile," where Trahan's body might have been buried. (Tr. Vol. IV, p. 107). At that point, Officer Kirkpatrick radioed for assistance. Detective Daniel Kepler (Detective Kepler) conducted a recorded interview of Murphy at the scene. During the interview, Murphy

notified Detective Kepler of Bixler's remark regarding the blood on his sock, and then he led the officers to the burn pile on the railroad tracks. Several cigarette butts were located at the burn site.

[11] The first K-9 officer that searched the mulch pile did not detect a body. Officer Kilpatrick informed Murphy of the negative result, and Murphy insisted on another thorough search. A second, more experienced K-9 officer, conducted a search and successfully detected a body in the mulch pile. Crime scene technicians carefully cleared the mulch, and Trahan's decomposing body was located.

[12] After the discovery of Trahan's body, several officers were sent to Cornwell's and Bixler's residence to monitor their movements. When Bixler and Cornwell exited their house, they were detained and taken to the homicide office for a formal interview at approximately 3:00 p.m. During the interview, just as Murphy had narrated, Detective Kepler observed that Bixler had "blood on his right sock." (Tr. Vol. IV, p. 55). Also, Detective Kepler independently observed burrs stuck on Bixler's shirt.

[13] Bixler's and Cornwell's interview concluded at approximately 9.00 p.m. At the close of the interview, and after obtaining consent from both men, Detective Kepler collected buccal swabs. Also, in order to preserve the evidentiary "integrity" of the evidence on Bixler's and Cornwell's clothes, which Detective Kepler objectively believed could have been lost during Bixler's and Cornwell's transportation to jail, Detective Kepler collected their clothes, which he then

placed in separate labeled bags. (Tr. Vol. V, p. 37). Detective Kepler thereafter placed the bagged clothes in a locked cabinet, and he planned on obtaining a search warrant the next day to subject Bixler's and Cornwell's clothes to DNA testing.

[14] Several days after Bixler's and Cornwell's arrest, Farfan, who was still in possession of Bixler's drawstring backpack, turned it over to the police. The backpack contained a pair of heavily bloodstained blue jeans, a pair of sweatpants, and several mulch chips. Forensic testing of the bloodstained jeans revealed Trahan's DNA in three separate places. Analysis of a Newport cigarette brand found by the burn cite showed the presence of Bixler's DNA. After the police obtained a search warrant for Bixler's clothes worn at the time of his arrest, Trahan's blood was found on one of Bixler's socks.

[15] An autopsy revealed that Trahan had "stabbing and incised wounds" to the "front of the neck and side of the neck" and hemorrhaging within the neck. (Tr. Vol. IV, p. 242). Also, Trahan had multiple sharp stab wounds to his arm, torso, and back; and he been strangled. In addition, there was a "blunt force injury" to the back of his head and facial fractures. The cause of death was determined to be "mixed modality trauma," with the manner of death being homicide. (Tr. Vol. IV, p. 242).

[16] On August 17, 2015, the State filed an Information, charging Bixler with murder. On May 22, 2017, the State amended the charging Information, changing the date of the offense. A two-day jury trial which was conducted

between May 23-24, 2017, ended up with a hung jury and a mistrial was declared. On September 7, 2017, Bixler waived his right to a jury trial. On October 2 and October 3, 2017, a bench trial was conducted. At the close of the evidence, the trial court found Bixler guilty as charged. On November 17, 2017, the trial court conducted a sentencing hearing. At the close of the evidence, the trial court sentenced Bixler to fifty-five years, with five years suspended to probation.

[17] Bixler now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

I. *Admission of the Evidence*

[18] Rulings on the admissibility of evidence fall within the sound discretion of the trial court. *Wise v. State*, 26 N.E.3d 137, 140-41 (Ind. Ct. App. 2015), *trans. denied*. We review such rulings for an abuse of that discretion, which occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id*.

[19] Bixler argues that the trial court abused its discretion by admitting evidence of the results of the DNA testing of the sock he wore on the day of his arrest. He contends that "[A]lthough the police had probable cause to arrest him, and did in fact place him under arrest, they did not obtain a warrant to seize and search the clothes he was wearing until the next day." (Appellant's Br. p. 11). Bixler maintains that the warrantless seizure of his sock was in violation of his rights

under both the Fourth Amendment of the United States Constitution, and Article 1, Section 11 of the Indiana Constitution.

*A. Fourth Amendment*

[20] The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[21] "The protections granted by the Fourth Amendment have been extended to the states through the Fourteenth Amendment." *J.B. v. State*, 30 N.E.3d 51, 54 (Ind. Ct. App. 2015). "The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, homes, and belongings." *State v. Parrott*, 69 N.E.3d 535, 541 (Ind. Ct. App. 2017), *trans. denied*. The touchstone of a Fourth Amendment analysis "is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). A warrantless seizure is *per se* unreasonable, and the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *Jacobs v. State*, 76 N.E.3d 846, 850 (Ind. 2017).

[22]     Bixler maintains that the seizure of the clothes that he wore at the time of his arrest was not part of a valid inventory search. A valid inventory search is a well-recognized exception to the warrant requirement. *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006). In determining the propriety of an inventory search, the threshold question in determining the propriety of an inventory search is whether the impoundment itself was proper. *Jackson v. State*, 890 N.E.2d 11, 17 (Ind. Ct. App. 2008). An impoundment is proper when it is either part of the routine administrative caretaking functions of the police or when it is authorized by statute. *Id.*

[23]     Detective Kepler testified that he had been interviewing Bixler and Cornwell "since 3:00 [p.m.] and it was 9:00[p.m.] They hadn't eaten." (Tr. Vol. V, p. 41). Based on Detective Kepler's concern, he released Bixler to the jail officials, however, prior to Bixler's transportation to the jail, he seized Bixler's clothes for safekeeping, and he testified that he intended to obtain a search warrant the following day. Furthermore, no evidence was presented that Detective Kepler did not follow established police procedure by seizing Bixler's clothes ahead of Bixler's booking at the jail. *See Jackson*, 890 N.E.2d at 19 ("The towing of the car was authorized by statute and by police policy, and the inventory of the vehicle was similarly authorized by established police policy. Although this policy was not thoroughly followed, this alone does not establish that the inventory was a pretext. Inventory searches are not always unreasonable when standard procedures are not followed."). Moreover, the State points to at least

two applicable exceptions to the warrant requirement under the Fourth Amendment of the United States Constitution.

[24] The State argues that the seizure of Bixler's clothes was justified based on exigent circumstances. We note that the warrant requirement becomes inapplicable where the "'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978). Among the well-known circumstances that have justified a warrantless search or seizure include entries: (1) to prevent bodily harm or death; (2) to aid a person in need of assistance; (3) to protect private property; and (4) to prevent actual or imminent destruction or removal of evidence before a search warrant may be obtained. *Willis v. State*, 780 N.E.2d 423, 428 (Ind. Ct. App. 2002). A warrantless seizure is *per se* unreasonable, and the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *Jacobs*, 76 N.E.3d at 850.

[25] Detective Kepler testified that it was important to seize Bixler's clothes ahead of his booking in jail so as to preserve the evidentiary "integrity" of the evidence. (Tr. Vol. V, p. 37). He was concerned that "inside the wagon[,] [Bixler] could have taken off his socks and gave them to somebody else. I mean, there's just an untold number of bad things that could have happened to the good evidence that we had." (Tr. Vol. V, p. 37). Based on Detective Kepler's testimony, we find that exigent circumstances existed—*i.e.*, there was a possibility that the

State would have lost a key piece of evidence relating to Trahan's murder—and a warrant was not necessary.

[26] Lastly, the State argues that even if the seizure of Bixler's clothes was improper, we should sustain the seizure based on the inevitable discovery rule. Under the Fourth Amendment, the inevitable discovery exception to the exclusionary rule "permits the introduction of evidence that eventually would have been located had there been no error, for in that instance 'there is no nexus sufficient to provide a taint.'" *Shultz v. State*, 742 N.E.2d 961, 965 (Ind. Ct. App. 2001), *trans. denied*. We, however, choose not to apply this doctrine since we have determined that exigent circumstances existed to justify the seizure of Bixler's clothes at the homicide office. Moreover, the inevitable discovery doctrine has not been adopted in Indiana. *See Gyamfi v. State*, 15 N.E.3d 1131, 1138 (Ind. Ct. App. 2014); *Ammons v. State*, 770 N.E.2d 927, 935 (Ind. Ct. App. 2002)

B. *Article 1, Section 11*

[27] Although the language of Article 1, Section 11 of the Indiana Constitution tracks the language of the Fourth Amendment, we use a different method of analysis. That is, the legality of a search or seizure under the Indiana Constitution requires an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). In evaluating reasonableness, we consider three factors: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's

ordinary activities, and (3) the extent of law enforcement needs. *Watkins v. State*, 85 N.E.3d 597, 601 (Ind. 2017).

[28] Bixler readily concedes that "the degree of suspicion that an offense [had] occurred was very high in light of information provided to the police by . . . Murphy. However, the State . . . failed to show a basis for the seizure under the second and third" *Litchfield* factors. We disagree.

[29] With regards to the second *Litchfield* factor, any intrusion on Bixler's ordinary activities when his clothes were taken incident to the murder arrest was slight, given that his clothes would have been taken shortly after he was booked into jail. Also, it is apparent that the extent to which law enforcement needs to investigate a crime was high following Murphy's statement to the police that Bixler had stated that he possibly had Trahan's blood on his sock, and the subsequent discovery of Trahan's decomposing body in the mulch pile. Under the totality of the circumstances, we conclude that the seizure of Bixler's clothes by the homicide office prior to his transportation to jail was reasonable, and Bixler's rights were not violated under Article I, Section 11 of the Indiana Constitution. Consequently, the trial court did not abuse its discretion in admitting DNA evidence obtained from Bixler's sock.

## II. *Sufficiency of the Evidence*

[30] Bixler contends there is insufficient evidence to support his murder conviction. Our standard of review for sufficiency of the evidence claims is well settled. When reviewing the sufficiency of the evidence supporting a conviction, we will

not reweigh the evidence or judge the credibility of witnesses. *Staton v. State*, 853 N.E.2d 470, 474 (Ind. 2006). We must look to the evidence most favorable to the conviction together with all reasonable inferences to be drawn from that evidence. *Id.* We will affirm a conviction if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id*.

[31] A person who knowingly or intentionally kills another human being commits murder, a felony. I.C. § 35-42-1-1. Evidence was presented that Bixler, Cornwell, Murphy, and Trahan all lived in one house in Indianapolis. Also, evidence was presented that Cornwell did not get along with Trahan, and in the past, the two had engaged in verbal and physical altercations. On August 14, 2015, at approximately 2:00 a.m., Cornwell, Bixler and Trahan, left the house together; however, at approximately 5:00 a.m., only Cornwell and Bixler returned to the house. Shortly after returning to the residence, Cornwell informed Murphy of a "frightening" event, implying Trahan's murder. (Tr. Vol. IV, p. 52). During Cornwell's narration of the events leading to Trahan's murder, Bixler failed to distance himself from any involvement. Moreover, Bixler was one of the last people to be seen with Trahan, and Bixler was in the company of Cornwell, who was known to have had issues with Trahan.

[32] Bixler argues that while circumstantial evidence may have established that he was present at the murder scene, or that he might have even assisted Cornwell in disposing Trahan's body, it was not probative to prove that he committed the

alleged crime. It is well established that a murder conviction may be sustained on circumstantial evidence alone. *Lacey v. State*, 755 N.E.2d 576, 578 (Ind. 2001).

[33] As Bixler concedes, there was circumstantial evidence placing him at the scene of the crime, thereby implicating him in Trahan's murder. Specifically, Bixler remained by Cornwell's side and participated in burning evidence relating to Trahan's murder by the train tracks. Also, Bixler's DNA was found on a cigarette butt collected at the burn site, and when the men went to the abandoned building, Bixler expressed to Murphy and Cornwell that he might have had Trahan's blood on his sock. DNA analysis of Bixler's sock confirmed Bixler's suspicion. In addition, Bixler's conduct after he and Cornwell revealed the details of Trahan's murder to Murphy, further evinced his participation. Unlike Murphy who was later encouraged by his father to report Trahan's murder to the police, Bixler attempted to rid himself of any incriminating evidence. The day after Trahan was murdered, Bixler called his friend Farfan and gave her a drawstring backpack that contained bloodied jeans. Bixler then directed Farfan to clean the clothes and store the bag on an unreachable shelf. The drawstring bag was later turned over to the police, and DNA testing revealed Trahan's blood on the heavily bloodied blue jeans. When Farfan later visited Bixler in jail, Bixler informed Farfan that his life was in her hands. Based on the foregoing, we find that the State presented sufficient evidence beyond a reasonable doubt to support Bixler's murder conviction.

# CONCLUSION

[34] In light of the above, we hold that the trial court did not abuse its discretion in admitting DNA evidence obtained from Bixler's sock, and the State presented sufficient evidence beyond a reasonable doubt to sustain Bixler's murder conviction.

[35] Affirmed.

[36] May, J. and Mathias, J. concur