In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1715

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER RADFORD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cr-00395-TWP-DLP-4 — **Tanya Walton Pratt**, *Chief Judge.*

SUBMITTED JANUARY 20, 2022[*] — DECIDED JUNE 30, 2022

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges*.

ROVNER, *Circuit Judge.* Christopher Radford pled guilty to
one count of possession with intent to distribute a controlled

---

[*] On January 6, 2022, we granted the parties' joint motion to waive oral
argument. Thus, the appeal is submitted on the briefs and record. Fed. R.
App. P. 34(f); Cir. R. 34(e).

substance, in violation of 21 U.S.C. § 841(a)(1). As part of his plea agreement, he retained his right to appeal the denial of his motion to suppress in which he challenged a traffic stop and accompanying search of his person. We affirm.

**I.**

On November 19, 2018, the Drug Enforcement Agency ("DEA") was conducting surveillance on a suspected drug house in the vicinity of Indianapolis, Indiana. Detective John Maples, a fifteen-year veteran of the nearby Brownsburg Police Department and an officer for the United Drug Task Force, was assisting the DEA that day. As a member of the task force, Maples often conducted traffic stops to investigate drug trafficking on routes that passed through the Brownsburg area. Maples estimated that, throughout his career, he had conducted hundreds and perhaps thousands of traffic stops.

At approximately 2:15 p.m. on that day, Maples was monitoring traffic on Rockville Road when DEA agents at the surveillance site reported that a white Audi had just departed from the suspected drug house and was heading towards Rockville Road. Surveillance units followed the Audi and watched it enter and leave a strip mall parking lot without stopping to park. The car then proceeded onto Rockville Road and Maples began to monitor it for possible traffic violations. From his position in an LA Fitness parking lot on the north side of Rockville Road, Maples observed the Audi pass him at approximately 40 to 45 miles per hour, following the car in front of it by less than a car length. He decided to pull the driver of the Audi over for the infraction of following too closely, in violation of Ind. Code § 9-21-8-14. Maples pulled

into traffic and once he was able to maneuver behind the Audi, he activated his flashing lights and followed the Audi into the parking lot of a PNC Bank. The Audi pulled into a parking spot at the bank and Maples stopped behind the Audi, blocking it from behind.

As Maples approached the Audi on the driver's side of the car, he noticed the driver making "quick and furtive movements with his hands" in the right side of the driver's seat. As the driver turned to exit the car, he appeared startled that Maples was standing at his door. When the driver, the defendant Christopher Radford, began to open the door, Maples pulled the door open from the outside and saw Radford reach for a cell phone. Maples directed him to place the phone on the dashboard and exit the vehicle. Radford did not initially comply but reached for a second phone. Maples again directed Radford to place the phones on the dashboard and exit the car. Radford then complied.

As Radford exited the car, he reached for his belt area and continued making quick movements with his hands while holding his left arm close to his body. After Radford reached towards his beltline with his left hand, Maples commenced a pat-down search which we will describe more completely below. During the search, Maples saw a vacuum-sealed plastic bag in Radford's left inner pocket that Maples believed contained heroin. With the assistance of another officer, Maples then handcuffed Radford and continued to search him, removing the bag from Radford's pocket. The officers then checked Radford's license status and whether he had any outstanding warrants. Minutes after Radford was taken into custody, Maples learned that there was an outstanding

warrant for Radford's arrest based on charges for operating a vehicle after a lifetime suspension of his license. Maples also learned that Radford was listed as a habitual traffic violator,[1] and had a prior felony conviction related to narcotics. A brief inventory search of the Audi revealed a small caliber revolver in the cargo compartment of the driver's side door.

The substance in the vacuum-sealed plastic bag turned out to be fentanyl rather than heroin, and Radford was charged with possession with intent to deliver a controlled substance, in violation of 21 U.S.C. § 841(a)(1). Radford moved to suppress the evidence obtained at the traffic stop. He contended that, on the day he was stopped, he was driving under the speed limit, was operating his vehicle in a safe manner and did not commit any traffic violations. In an affidavit that accompanied his motion to suppress, he averred that he never followed any vehicle by less than a car length. Radford also asserted in his motion that the officer's view would have been obstructed by businesses and a tree line given his claimed position in an LA Fitness parking lot on Rockville Road. He also pointed out that there were no traffic violations recorded during any part of Maples' video of the incident. Radford argued that the stop and subsequent search both violated the Fourth Amendment

---

[1] Ind. Code § 9-30-10-4 sets forth the criteria for drivers to be adjudged habitual violators of the traffic laws, and Ind. Code § 9-30-10-5 provides for various periods of license suspension depending on the underlying traffic offenses. The public docket of the Boone County Superior Court shows that Radford eventually pled guilty to the lesser charge of driving on a suspended license. Case No. 06D02-1207-FC-000433, in Boone Superior Court 2. Available at https://www.in.gov/courts/local/boone-county/ (last visited June 16, 2022).

because he had not committed any traffic violation and because Maples' search of his person was not justified by any exigent circumstances, except those created by Maples' own actions.

The government responded that a hearing was necessary in order for the court to make a credibility determination between Radford's version of the incident and that of Detective Maples, who had also provided affidavits describing the circumstances of the stop. The government argued that the evidence would show that the officer had probable cause to stop the Audi for following too closely, and that Maples had a reasonable suspicion that Radford was armed based on the reports of other officers and on Radford's actions during the stop. The government also contended that the controlled substance was properly seized because it was in plain view in Radford's pocket during the frisk and the incriminating nature of the package was immediately apparent to the experienced officer. Radford filed no reply to the government's brief.

The court subsequently held a hearing at which both Maples and Radford testified. Maples explained that he had moved into the exit lane of the LA Fitness parking lot on being notified by the officers surveilling the drug house that the white Audi was approaching. Maples affirmed that a photo-graph of the scene represented an accurate picture of the placement of his car in the exit lane, close to and facing Rockville Road when the white Audi passed him, making plain that he had a clear and unobstructed sight line to traffic on Rockville Road. Maples testified that prior to the stop, he had been informed that the white Audi had driven evasively, and entered and exited a parking lot without stopping or parking. In his experience, this was a tactic practiced by persons in the

drug trade to check if anyone is following them, contributing to his suspicions about the driver of the Audi.

Maples testified that he saw the Audi traveling approximately 40 to 45 miles per hour, and less than a car length away from the car in front of it at the time it passed his position. He testified that a safe distance is approximately one car length for every ten miles per hour of speed, so that at 40 to 45 miles per hour, the Audi should have allowed four to five car lengths behind the vehicle it trailed. Maples decided to stop the car for following too closely under Ind. Code § 9-21-8-14, which would allow him to determine whether the driver was properly licensed, whether the vehicle was properly licensed and whether there were any outstanding warrants on the driver.

Maples explained that on the day of the stop, he was using a new video system that he had not previously employed. The system was designed to begin recording when the officer activates the police car's flashing lights, which Maples did not do until he was on Rockville Road and positioned behind the white Audi, after he observed the infraction. The system then kept a recording from one minute prior to activation of the lights and continued recording going forward. Maples also explained his escalating concern with Radford's movements from the moment he approached the car until Radford was handcuffed. Among the factors that raised his level of concern for safety, he testified that Radford first appeared startled to see the officer, that Radford did not put down his phone when directed to do so, and that he then reached for a second phone. Maples explained that this indicated to him that Radford might have something on the phone that he wished to conceal. Once out of the car, Radford moved his hands towards his beltline,

an area where a gun might be stowed, and held his left arm tightly close to his body, leading Maples to be concerned that Radford had a weapon hidden on the left side.

Maples testified that during the search, Radford turned towards him in such a way that his jacket fell open, and Maples looked directly down into the jacket where he saw a vacuum-sealed plastic bag containing what he believed to be heroin based on his law enforcement training and experience. He testified that vacuum sealing is used for dealer-sized quantities of certain drugs, including heroin. Maples confirmed that he did not manipulate the jacket in any way to see the bag, but rather that the jacket fell open through Radford's movements during the search. He described the package as "sticking out of an inside pocket on the left side" of the jacket.

Radford testified that he first drove east on Rockville Road and through a parking lot without stopping because he was looking for a Chinese restaurant. When he did not see one, he left the lot and proceeded west on Rockville because he needed to go to the bank. He testified that, at the moment he passed the LA Fitness parking lot, he was traveling at most 30 miles per hour because he had just taken off from a red light at the intersection where Maples was stationed and he did not have sufficient time to accelerate to 45 miles per hour. He denied that he ever followed a car on Rockville Road by less than the length of a car, and he denied that he was operating the vehicle in a dangerous manner. He affirmed on cross-examination that he was stopped at a red light at the intersection where Maples claimed to see him pass at 40 to 45 miles per hour, and asserted that Maples' testimony that Radford had a green light was inaccurate. Radford asserted that Maples physically pulled him

from the car despite the video evidence showing that Radford exited the car under his own power. He also denied that he held his left arm against his body after exiting the car, claiming that he put both arms in the air for the pat-down search, again despite video evidence to the contrary. After asserting that he drove safely that day and considered himself a safe driver, the government questioned him regarding fifteen prior occasions when he had been pulled over and charged with a traffic offense, and he confirmed that he did recall being pulled over in his "younger years." He also claimed that, despite his extensive experience in being pulled over, he was unaware that Maples was pulling him over that day until Maples appeared at his car door.

The court entertained argument from counsel after the testimony. The government added only that whether Radford was aware that Maples had pulled him over had no bearing on Maples' observations of Radford's furtive movements in the car that contributed to the officer's reasonable suspicion that Radford was armed, justifying the pat-down search. Defense counsel argued only that the stop was pretextual and that the government had failed to meet its burden of showing that Radford had violated any traffic laws, emphasizing that Maples failed to catch the alleged infraction on the video recording. The court noted that "what it's going to come down to is a credibility determination." R. 190, at 75.

In a written ruling, the court denied the motion to suppress. *United States v. Radford*, 2019 WL 6682172 (S.D. Ind. Dec. 3, 2019). In its findings of fact, the court credited Radford's claim that he was not aware that he was being stopped by a police officer and was surprised to find Maples at the door of his car.

In every other respect, the court adopted Maples' version of the stop as we have recounted it. In addition, the court found that the suspected heroin tested positive for fentanyl, a search of the vehicle turned up a gun in the driver's side door, and Maples learned that there was an outstanding warrant for Radford on the charge of operating a vehicle as a lifetime habitual traffic violator.

The court then rejected Radford's arguments that Maples lacked probable cause to make the traffic stop, and found that the subsequent search of Radford's person was supported by reasonable suspicion. Responding to the arguments that Radford made in his motion to suppress, the court found that Maples had a credible explanation for the lack of video of the traffic infraction itself and that photo exhibits demonstrated that Maples did have a clear sight line to traffic on Rockville Road. In judging the credibility of Radford's claim that he had not committed any traffic infraction, the court noted that Radford had previously been pulled over fifteen times between 2003 and 2012, and had been charged with a criminal traffic offense on each occasion. The court also noted that it was reasonable to believe that an experienced officer like Maples had waited until he observed a traffic infraction before effecting a stop, and that it is not uncommon for motorists to follow the car ahead of them by less than a car length. All in all, the court found that the government proved by a preponderance of the evidence that Maples observed Radford commit a traffic infraction before stopping him that day. The court also found that the pat-down search of Radford was justified by reasonable suspicion that Radford was armed because Maples had been informed by other officers that Radford had just departed

a suspected drug house; Radford made quick movements with his hands and his phones as he emerged from the car; Radford appeared very nervous and was at times non-compliant with Maples' directives; Radford kept his left arm tensed with his hand near his beltline; and Radford repeatedly reached for his belt area where guns are commonly kept. Finally, the court concluded that the package was recovered not as a direct result of the pat-down search but because Maples saw the package in plain view when Radford turned toward him, and the criminal nature of the vacuum-sealed package was immediately apparent to Maples. The court therefore denied the motion to suppress. Radford appeals.

## II.

On appeal, Radford contends that the stop was not supported by probable cause because the government failed to satisfy its burden of proof and the court used an inappropriate and unreasonable methodology in reaching its credibility finding. Radford also asserts that Maples conducted a "repeated" frisk that continued long after a reasonable officer would have concluded that Radford was not armed, and the search transformed into an arrest without probable cause once Radford was handcuffed. Finally, Radford asserts that the vacuum-sealed package was not in plain view and its criminal nature was not immediately apparent. In considering a district court's decision on a motion to suppress, we review findings of fact for clear error and questions of law *de novo*. *United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014); *United States v. Garcia–Garcia*, 633 F.3d 608, 612 (7th Cir. 2011). *See also Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A]s a general matter determinations of reasonable suspicion and probable cause

should be reviewed *de novo* on appeal. … [A] reviewing court should … review findings of historical fact only for clear error[.]"). The prosecution bears the burden of proving by a preponderance of the evidence that a warrantless stop is supported by probable cause. *Peters*, 743 F.3d at 1116; *Garcia–Garcia*, 633 F.3d at 612. When a police officer reasonably believes that a driver has committed even a minor traffic offense, probable cause supports the stop. *Whren v. United States*, 517 U.S. 806, 819 (1996); *Peters*, 743 F.3d at 1116.[2] An officer making a traffic stop may "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). We would normally review the "plain view" seizure of contraband as we would any other part of the motion to suppress but in the district court, Radford relied entirely on the validity of the stop and the pat-down search in asserting that the physical evidence of the vacuum-sealed package should be suppressed; he presented no evidence or argument in support of his claim now that the officer "manipulated" Radford in order to make the package visible, and that the incriminating nature of the package was not immediately apparent. Radford also failed to raise any claim in the district court that the use of handcuffs transformed the pat-down into an arrest lacking probable

---

[2] On appeal, the government seeks to justify the stop using the reasonable suspicion standard rather than probable cause. Because the government relied solely on probable cause in the district court, we employ that standard here. Obviously, a stop that meets the more exacting standard for probable cause will also meet the criteria for reasonable suspicion.

cause. We will therefore review those claims for plain error only.

**A.**

We begin with the stop itself and with the credibility determination that formed the basis for the district court's ruling. According to Radford, the court made a "methodology" error in assessing the credibility question and we should therefore review that decision *de novo* rather than for clear error. In particular, he first contends that the district court confused issues of historic fact with the ultimate fact and simply chose between Maples' and Radford's assessments of the ultimate fact of whether he had committed the offense of following too closely:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact[.]

*Ornelas*, 517 U.S. at 696–97.

A review of the district court's order demonstrates that the court made no such mistake. In the section of its opinion setting forth its findings of fact, the court made the appropriate findings of historical fact by crediting Maples' testimony that

he saw the white Audi pass his location at 40 to 45 miles per hour while traveling less than a car length behind the car in front of it. *Radford*, 2019 WL 6682172, at *1. In assessing Maples' credibility, the court specifically addressed Radford's arguments: that Maples did not have a clear line of sight to traffic, and that no infraction was recorded on the video of the stop. The court found that the photographic evidence supported Maples' claim that he did have a direct view of the Audi as it passed, and found that Maples supplied a credible explanation regarding the lack of video evidence due to the operation of the new video equipment (which did not begin recording until Maples activated his flashing lights). The Audi's speed, the distance between the cars, the sight line, and the operation of the video camera are all historical facts underlying the credibility and probable cause determinations, and the court's rejection of the challenge to Maples' credibility in finding these facts was not based on any legal or "methodology" error.

As for judging the credibility of Radford's assertions that he never exceeded 30 miles per hour, never followed a car by less than a car length and did not commit any traffic infractions, the court considered Radford's alarmingly extensive history of bad driving. In its findings of fact, the court noted that a warrant check for Radford had revealed an outstanding warrant for driving on a permanently suspended license. The evidence that Radford had received fifteen citations in ten years was certainly relevant to assessing whether Radford was accurately or credibly judging his speed at the moment he passed Maples or correctly assessing the distance between his car and the car he trailed. We agree with Radford that his personal assessment of whether he committed any traffic infraction was irrelevant to

the ultimate question of whether a reasonable officer could conclude that he violated the Indiana statute, but we can certainly understand why the district court scoffed at his claim, especially in light of Radford's status as a habitual traffic violator with an outstanding warrant for driving on a permanently suspended license. Because his license was suspended, *any* driving Radford did that day would have constituted a traffic infraction, even though Maples did not know that until after the stop was effected and the warrant check was completed. In any case, the court did make appropriate findings of historical fact to support the ultimate conclusion that a reasonable officer would find that Radford committed the infraction of following too closely.[3]

---

[3] The district court made two stray remarks that were not relevant to its assessment of Radford's credibility: that it is reasonable to believe that officers are trained to wait for a traffic violation before making a stop, and that it is not uncommon for motorists to follow the car ahead of them by less than a car length. Although both statements are arguably true, they have no relevance to the question of whether Maples followed his training on this day, or whether Radford was less than a car length away from the car ahead of him on this occasion. Our review of the record as a whole convinces us that the court did not rely on these observations in making its findings. The court made clear that it was aware this was a credibility contest between two versions of the material facts, namely the speed of the Audi and the distance between the Audi and the car ahead. R. 190, at 75; *Radford*, 2019 WL 6682172, at *2. The court's credibility finding for Maples appropriately rested on his convincing testimony regarding the operation of the video equipment, and the photographic evidence corroborating his claim of a clear sight line. The record, including the video, supplies plenty of evidence supporting the court's credibility findings.

Radford also asserts that the court applied the wrong legal standard to the ultimate question of whether he had committed the offense of following too closely. Indiana law provides, that "[a] person who drives a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of both vehicles, the time interval between vehicles, and the condition of the highway." Ind. Code § 9-21-8-14. Radford cites our opinion in *Peters* as controlling the question of whether a driver is violating the Indiana statute. According to Radford, we reaffirmed there that "in assessing whether a vehicle is following another more closely than is reasonable and prudent under Indiana law, the 'use of the 'two-second rule' as a guide for reasonableness comports with Indiana law.'" *Peters*, 743 F.3d at 1116 (quoting *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005)). Radford complains that the district court failed to employ the *Peters* standard and that the record therefore lacked any evidence regarding the amount of time Radford required to avoid a collision, which is the purpose of the statute. But we also made clear in *Peters* that, although the two-second rule was a useful measure of reasonableness for the purposes of the statute, there is no clear error in a court crediting the truthful testimony of an experienced officer's visual estimate of the speed of a car or the distance between two cars. 743 F.3d at 1117 (although an officer can check a car's speed with radar, compare the car's speed with that of his own vehicle, or count the seconds to judge the distance between two vehicles, "none of those things [are] necessary for the court to credit … truthful testimony that … an experienced police officer … judged the distance to be too short for cars moving so quickly"). We also

noted in *Peters* that, "[i]f an officer knowing these facts could reasonably conclude that this combination of speed and distance violated Indiana law, that is all that is necessary to support probable cause." 743 F.3d at 1117. This is not a close case: Maples credibly testified to the court's satisfaction that the Audi was traveling 40 to 45 miles per hour and was less than a car length from the car ahead of it. Any reasonable officer could easily conclude without any other information that this amounted to following "more closely than is reasonable and prudent" in violation of the statute. There was no error in the court's conclusion that the government met its burden of establishing probable cause for the stop of the Audi.

**B.**

Radford next complains that the frisk, which he now characterizes as two separate frisks, continued long after a reasonable officer would have concluded that Radford was not armed. According to Radford, after a reasonable officer would have ended the protective pat-down, the officer instead continued and pursued an object in Radford's pocket that the officer did not believe to be a weapon. Radford also objects to the officers' use of handcuffs during the pat-down, characterizing the move as an arrest lacking probable cause. Finally, he contends that the district court erred in holding that Maples permissibly discovered the package under the plain-view doctrine, contending both that the object was not in plain view and that its incriminating nature was not immediately apparent.

We begin by noting that Radford no longer appears to object to the officer's decision to conduct a frisk in this case,

and nor could he plausibly claim that the officer lacked reasonable suspicion that he was armed and dangerous. In the course of a traffic stop, an officer is justified in conducting a limited search for weapons if the officer reasonably concludes that the person who has been legitimately stopped might be armed and presently dangerous. *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977). At the time Maples stopped the car, he knew that it had just come from a house being monitored by the DEA as a drug house and had engaged in a driving pattern consistent with evading detection. After the stop, Radford immediately behaved in a manner that would have alarmed any police officer. He failed to follow a directive to put down his phone, reached for a second phone after that directive, made quick movements with his hands while he was still in the car and after he exited, reached for his waistband more than once, and held his left arm stiffly and close to his side as if hiding something on that part of his body. The district court characterized Radford's behavior as "nervous and at times noncompliant." As Maples tried to gain control of the situation, Radford never stopped moving, even as Maples told him that his movements were making the officer nervous. The indications from DEA surveillance that Radford might be involved in drug dealing, his nervous behavior and alarming movements, and his failure to comply with the officer's directives all justified the officer's decision to search for weapons. *See United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999). In this appeal, it is not the frisk itself to which Radford objects but the scope of the frisk, which he contends led to the discovery of the package inside his jacket.

Before we directly address this claim, we note that in the
regular course of the traffic stop check on Radford's driver's
license (which was complicated by his inability to produce the
license on request) and the check for outstanding warrants,
Maples learned that there was an outstanding warrant for
Radford's arrest for a previous charge of driving on a perma-
nently suspended license. Absent anything else that they found
that day, that warrant supplied the officers with all the
probable cause they needed to take Radford into custody and
search both his person and his car incident to that arrest. Thus,
the discovery of the fentanyl in Radford's jacket and the
handgun in the pocket of the driver's door would have been
inevitable. The government says nothing about this straight-
forward, alternative rationale for upholding the seizure of the
drugs and did not raise an inevitable discovery argument in
the district court, forfeiting the issue on appeal. *See United
States v. Edwards*, 34 F.4th 570, 583 (7th Cir. 2022). We are not
bound by the government's view, and we may affirm the
district court's decision on any ground supported by the
record. *Edwards*, 34 F.4th at 583–84. We may base our decision
on a forfeited ground when the record presents an exceptional
case. *Edwards*, 34 F.4th at 584. This is not an exceptional case,
but in light of Radford's forfeiture of some of the issues he
argues on appeal, this alternative ground will inform our
analysis, as we explain below.

In his motion to suppress, Radford relied almost entirely on
the legitimacy of the traffic stop in arguing that the evidence
seized during the stop should be suppressed. We have re-
solved that issue against Radford. As for the excessive scope of
the pat-down search, the use of handcuffs during the pat-

down, and the challenge to the district court's finding that the package of drugs was appropriately seized under the plain view doctrine, Radford raised none of these arguments before the district court and the government urges us to review them for plain error only. Government's Brief, at 19, 28–29. We accept the government's characterization of these issues as forfeited and we review them for plain error only. Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731 (1993) (Rule 52(b) "provides a court of appeals a limited power to correct errors that were forfeited because not timely raised in district court"). To prevail under this standard, the appellant must demonstrate that there is an error that is plain and that affects substantial rights. *Olano*, 507 U.S. at 732. Moreover, Rule 52(b) leaves the decision to correct a forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *Olano*, 507 U.S. at 732.

In assessing the claim that the frisk was excessively long, we have the benefit of the video and the full transcript of Maples describing the frisk and justifying each segment. We see no error in the court's conclusion that the frisk was warranted up to and including the point where the package was visible to Maples. The frisk began moments after Radford emerged from the car. Although Radford readily raised his right arm for the search, he kept his left arm down and close to his body, with his hand near his waistband, impeding the search of that side of his body. Maples discovered some hard objects in one pocket, which Radford described as rocks that he carried for his spiritual well-being. Maples paused the pat-

down to have Radford remove the rocks from his pockets and place them in the car. By Radford's estimation, the search had come to an end at that point, no reasonable officer would have remained concerned that he was armed, and so any continued search could not be justified.

But as is obvious from the video, the search was not yet complete. Because of Radford's movements and the manner in which he held his left arm close to his body during the first part of the search, Maples had not yet had full access to the left side of Radford's body. After Radford placed the stones in the car, he continued to hold his left arm close to his body and reach towards his waistband. As Maples testified, he therefore continued the search, staying very close to Radford and keeping a tight hold on Radford's left arm. Seconds later, Radford turned towards Maples and his jacket fell open. Maples could then see directly into the left side inner pocket of Radford's jacket, in which the vacuum-sealed package was plainly visible. Maples had already felt the pocket from the outside and knew it contained a firm package, a little larger than a cell phone. The district court credited Maples testimony that, because of his training and experience, he immediately recognized the package for what it was, namely, a dealer-sized quantity of narcotics. Although Maples believed from the appearance of the substance that it was heroin, it tested positive for fentanyl, which is also a controlled substance. At that point, Maples had probable cause to arrest Radford and place him in handcuffs.

We conclude that the district court did not plainly err in crediting Maples' testimony that he saw that package in plain view as he conducted a legitimate search for weapons, and

that, because of his training and experience, he recognized that package as containing narcotics. We also note that, even if Radford had shown plain error in the district court's conclusion that the pat-down search was legitimate and that the drugs came into plain view in the course of that search, this is not a case where we would exercise our discretion to correct any error. As we noted, the court should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings. *Olano*, 507 U.S. at 732. Because there was an active warrant for Radford's arrest, a warrant that came to light during the standard traffic-stop check of the license and for warrants, both the drugs and the gun inevitably would have been discovered when Radford was arrested on that warrant. Any error here would therefore not affect the fairness, integrity or public reputation of the proceedings.

### III.

We have considered Radford's remaining arguments and find no merit in them. The judgment of the district court is therefore

AFFIRMED.